DANIEL L. GERMAIN (CA SBN #143334)
germain@lalawyer.com
ROSMAN & GERMAIN APC
5959 Topanga Canyon Blvd.
Suite 360
Woodland Hills, CA 91367
Telephone: (818) 788-0877

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RHODIUM PIZZA PTY LTD, Derivatively on Behalf of RXSIGHT, INC.,<br>Plaintiff,<br>v.<br>RON KURTZ, SHELLEY THUNEN, J. ANDY CORLEY, WILLIAM J. LINK, JULIET TAMMENOMS BAKKER, JULIE B. ANDREWS, ROBERT J. PALMISANO, ROBERT WARNER, SHWETA SINGH MANIAR, and TAMARA R. FOUNTAIN,<br>Defendants,<br>and<br>RXSIGHT, INC.,<br>Nominal Defendant. | Case No.<br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br>**JURY TRIAL DEMANDED** |

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Rhodium Pizza Pty Ltd ("Plaintiff"), by its undersigned attorneys, derivatively on behalf of Nominal Defendant RxSight, Inc. ("RxSight" or the "Company"), files this Verified Shareholder Derivative Complaint against Ron Kurtz, Shelley Thunen, J. Andy Corley, William J. Link, Juliet Tammenoms Bakker, Julie B. Andrews, Robert J. Palmisano, Robert Warner, Shweta Singh Maniar, and Tamara R. Fountain (collectively, the "Individual Defendants") for breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 promulgated thereunder.

Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of RxSight's public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, conference call transcripts, news reports, securities analysts' reports, and the pleadings and orders filed in the related federal securities class action captioned *In re RxSight, Inc. Securities Litigation*, No. 8:25-cv-01596-FWS-KES (C.D. Cal.) (the "Securities Action"). Plaintiff believes that substantial additional evidentiary support for the allegations herein will exist after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Nominal Defendant RxSight against the Individual Defendants for breaches of their fiduciary duties as officers and/or directors of RxSight, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9.

2. RxSight is a medical technology company based in Aliso Viejo, California, that develops and sells products used to treat cataracts and to improve vision following cataract surgery. Its sole meaningful product is the RxSight Light Adjustable Lens system (the "RxSight System"), which pairs an implantable light adjustable lens (the "LAL" and the "LAL+," together "LALs") with a light delivery device ("LDD") that a physician uses after surgery to reshape the implanted lens. RxSight's business depends on two things: "adoption," meaning that ophthalmology practices purchase an LDD and prepare their staff to offer LAL procedures, and "utilization," meaning that those ophthalmology practices actually implant LALs in patients on a recurring basis.

3. Beginning on November 9, 2023 through at least July 8, 2025 (the "Relevant Period"), the Individual Defendants caused RxSight to falsely state to investors that LALs delivered glasses-free vision without the glare and halos associated with other premium lenses, that the RxSight System offered ophthalmology practices compelling economic returns, that adoption of the technology was "strong," and that every customer cohort was growing its utilization, with newer cohorts adopting faster than older ones.

4. In truth, as the Individual Defendants knew from, *inter alia*, internal LAL and LDD sales reports, "Study Patient" customer service data, Doctor Readiness reports, physician complaints logged on the American Society of Cataract and Refractive Surgery ("ASCRS") Ad Board, and weekly and monthly sales calls, most LAL patients still needed reading glasses, the post-operative adjustments and lock-ins consumed far more clinical time than represented, RxSight's core market was saturated by mid-2023, newer customers were adopting more slowly than earlier ones, and older customers' utilization was flat. RxSight also used a "Study Patient" rebate program that paid larger clients $500 per eye for each adjustment, which temporarily propped up LAL volumes and masked the deterioration.

5. The truth emerged through a series of partial disclosures between July 2024 and April 2025, and fully on July 8, 2025, when RxSight disclosed that its LDD sales had plunged to 40 units in the second quarter of 2025 from 73 units the prior quarter, that LAL sales had declined sequentially, and that it was cutting its full-year 2025 revenue guidance for the second time, to a range of $120 million to $130 million. On the accompanying conference call, Defendant Kurtz admitted that RxSight had been experiencing adoption challenges over the preceding several quarters, that newer customers were adopting more slowly than previous customers, and that utilization by older customers had been flat going back four quarters. On this news, RxSight's stock price fell $4.84 per share, from a close of $12.79 per share on July 8, 2025 to a close of $7.95 per share on July 9, 2025, a decline of nearly 38%. From the first partial disclosure in July 2024 to the final disclosure in July 2025, RxSight's stock price dropped from $56.99 per share to $7.95 per share, a decline of more than 86%.

6. To make matters worse, while RxSight's stock price was artificially inflated, the Individual Defendants personally profited. While in possession of material non-public information, Defendants Kurtz and Thunen sold more than $16.2 million of their own RxSight stock during the Relevant Period, and six of RxSight's outside directors sold, directly or through entities they control or manage, approximately $5.6 million more. In total, the Insider Selling Defendants (defined below) reaped approximately $21.9 million in proceeds before the truth was revealed.

7. The Individual Defendants' conduct is presently the subject of the Securities Action, a federal securities class action pending before the Honorable Fred W. Slaughter in this District. On May 21, 2026, the Court denied the defendants' motion to dismiss the Securities Action in its entirety, finding that the operative complaint adequately pleads both falsity and a strong inference of scienter.

8. Despite the substantial exposure the Individual Defendants' misconduct has created for the Company, in the form of, *inter alia*, the Securities Action itself, related litigation and defense costs, reputational harm, and the loss of approximately $1.87 billion in market capitalization between the May 2024 secondary offering and the end of the Relevant Period, no disinterested and independent majority of the Board has taken any action to investigate the misconduct described herein or to pursue the Company's claims against the wrongdoers. Plaintiff accordingly brings this action derivatively on behalf of RxSight to recover for the Company the damages caused by the Individual Defendants' breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the federal securities laws.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC.

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

12. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13. This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum

contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, RxSight maintains its principal executive offices in this District, the Securities Action is pending in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

***Plaintiff***

15. Plaintiff is, and has been at all relevant times, a stockholder of RxSight.

***Nominal Defendant***

16. Nominal Defendant RxSight is incorporated under the laws of Delaware, with its principal executive offices located at 100 Columbia, Aliso Viejo, California 92656. RxSight's common stock trades on the Nasdaq under the ticker symbol "RXST."

***Individual Defendants***

17. Defendant **Ron Kurtz** ("Kurtz") served as RxSight's President and Chief Executive Officer ("CEO"), and as a director of the Company, from 2016 until July 20, 2026. Effective July 20, 2026, Kurtz resigned from the Board and became the Company's Chief Medical Officer ("CMO"), a position he currently holds. According to RxSight's Proxy Statement filed with the SEC on April 21, 2025 (the "2025 Proxy"), Kurtz received total compensation of $6,982,453 for fiscal year 2024. According to RxSight's Proxy Statement filed with the SEC on April 28, 2026 (the "2026 Proxy"), Kurtz received total compensation of $4,650,661 for fiscal year 2025. Kurtz signed the Company's Annual Reports on Form 10-K for fiscal years 2023 and 2024 and certified the Company's Relevant Period Forms 10-Q and 10-K

pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). He is named as a defendant in the Securities Action.

18. The 2026 Proxy provided the following information about Defendant Kurtz:

> **Ron Kurtz, M.D.** Dr. Kurtz has served as our President and Chief Executive Officer, as well as on our Board since 2016. Prior to joining RxSight, he co-founded and served as President and Chief Executive Officer of LenSx Lasers, Inc. He became General Manager of Alcon LenSx, Inc after the company was acquired by Alcon Inc. (NYSE: ALC) in 2010. Dr. Kurtz previously co-founded IntraLase Corp. (NASDAQ: ILSE) serving as its initial President & CEO and then in other senior leadership positions. IntraLase became a publicly held NASDAQ-listed company in 2004 and was acquired by Advanced Medical Optics, Inc. (NYSE: AMO) in 2007. Dr. Kurtz has served on the faculty of both the University of California, Irvine, and the University of Michigan. He earned his B.A. in Biochemistry from Harvard College and his M.D. from the University of California, San Diego.
>
> We believe that Dr. Kurtz is qualified to serve on our Board due to his leadership track record, his experience as an ophthalmologist, and his service as our Chief Executive Officer and President.

19. During the Relevant Period, and while in possession of material non-public information, Defendant Kurtz sold 165,000 shares of RxSight common stock, held through Cricklewood LP, for proceeds of approximately $7,684,187.25.

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 12/14/2023 | $39.40 | 20,000 | $788,022.00 |
| 12/14/2023 | $40.01 | 20,000 | $800,164.00 |
| 12/27/2023 | $41.09 | 22,500 | $924,498.00 |
| 01/08/2024 | $43.50 | 31,250 | $1,359,375.00 |
| 01/08/2024 | $45.00 | 31,250 | $1,406,256.25 |
| 05/03/2024 | $60.15 | 40,000 | $2,405,872.00 |
| **TOTAL** | | **165,000** | **$7,684,187.25** |

20. Defendant **Shelley Thunen** ("Thunen") served as RxSight's Chief Financial Officer ("CFO") from February 2017 until January 11, 2026, and also served as Co-President beginning on or around July 2024. She previously served as the Company's Chief Administrative Officer from January 2016 to February 2017. Since leaving the CFO role, Thunen has continued to provide services to RxSight under a consulting agreement scheduled to run through December 31, 2026, under which her outstanding stock options continue to vest. According to the 2025 Proxy, Thunen received total compensation of $5,796,727 for fiscal year 2024. According to the 2026 Proxy, Thunen received total compensation of $2,855,137 for fiscal year 2025. Thunen signed the Company's Annual Reports on Form 10-K for fiscal years 2023 and 2024 and certified the Company's Relevant Period Forms 10-Q and 10-K pursuant to SOX. She is named as a defendant in the Securities Action.

21. The 2025 Proxy stated the following about Defendant Thunen:

> **Shelley Thunen.** Ms. Thunen joined RxSight, Inc. in January 2016 as our Chief Administrative Officer and has served as our Chief Financial Officer since February 2017. From January 2013 to October 2015, Ms. Thunen served as the Chief Financial Officer of Endologix, Inc. (NASDAQ:ELGX). From August 2010 to December 2012, Ms. Thunen served as Associate General Manager of Alcon LenSx, Inc. Prior to Alcon's (NYSE:ALC) acquisition of LenSx, Inc. in August 2010, she served as a board member and chair of the audit committee from April 2008 to August 2010, as well as Chief Financial Officer and Vice President, Operations from November 2009 to August 2010. Ms. Thunen joined IntraLase Corp. (NASDAQ:ILSE) in May 2001 and was its Chief Financial Officer and later Executive Vice President & Chief Financial Officer until its acquisition by Advanced Medical Optics, Inc. (NYSE:EYE) in April 2007. Ms. Thunen served on the board of directors of eyeonics, Inc. from June 2007 to February 2008, and as a board member and chair of the audit committee of Restoration Robotics, Inc. (NASDAQ:HAIR) from July 2015 to November 2019, prior to its acquisition by Venus Concept Inc. (NASDAQ:VERO). She also has served as a board member and audit committee chair of Surface Ophthalmics, Inc since August 2020. She also has served as a board member and audit committee chair of Aeon

Biopharma, Inc (NYSE:AEON), since June 2023, as well as a board member, audit committee chair and compensation committee member for LENZ Therapeutics, Inc. (NASDAQ: LENZ), since November 2023. Ms. Thunen received a B.A. in economics and an M.B.A. from the University of California, Irvine.

22. During the Relevant Period, and while in possession of material non-public information, Defendant Thunen sold 180,174 shares of RxSight common stock, directly and indirectly, for proceeds of approximately $8,540,214.83.

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 12/15/2023 | $39.31 | 10,000 | $393,120.00 |
| 12/15/2023 | $39.32 | 10,000 | $393,206.00 |
| 12/15/2023 | $39.35 | 20,000 | $786,984.00 |
| 01/02/2024 | $38.77 | 4,519 | $175,191.24 |
| 01/02/2024 | $39.63 | 5,481 | $217,217.51 |
| 01/26/2024 | $47.11 | 31,772 | $1,496,705.84 |
| 02/05/2024 | $47.02 | 9,125 | $429,086.70 |
| 02/06/2024 | $47.47 | 15,875 | $753,573.55 |
| 03/01/2024 | $54.95 | 1,166 | $64,065.87 |
| 03/01/2024 | $56.38 | 6,361 | $358,617.91 |
| 03/01/2024 | $57.03 | 2,473 | $141,041.87 |
| 04/01/2024 | $49.81 | 8,938 | $445,225.02 |
| 04/01/2024 | $49.81 | 8,857 | $441,207.03 |
| 04/01/2024 | $50.24 | 662 | $33,257.69 |
| 04/01/2024 | $50.27 | 800 | $40,218.00 |
| 04/01/2024 | $50.37 | 200 | $10,074.00 |
| 04/01/2024 | $51.50 | 543 | $27,964.50 |
| 05/01/2024 | $52.68 | 9,620 | $506,758.51 |
| 05/01/2024 | $53.04 | 380 | $20,154.21 |
| 07/01/2024 | $58.41 | 8,146 | $475,785.05 |
| 07/01/2024 | $58.55 | 6,599 | $386,366.17 |
| 07/01/2024 | $59.48 | 1,854 | $110,270.36 |
| 07/01/2024 | $59.56 | 1,803 | $107,394.07 |
| 10/01/2024 | $47.96 | 5,201 | $249,422.28 |

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 10/01/2024 | $48.69 | 9,521 | $463,560.35 |
| 10/01/2024 | $49.45 | 278 | $13,747.10 |
| **TOTAL** | | **180,174** | **$8,540,214.83** |

23. Defendant **J. Andy Corley** ("Corley") has served as a director of RxSight since January 2015 and as Chairman of the Board since July 2015. Corley has served on the Compensation Committee since January 2015 and served on the Corporate Governance and Nominating Committee (the "Governance Committee") beginning in July 2021, including throughout the Relevant Period. According to the 2025 Proxy, Corley received total compensation of $262,445 from the Company for fiscal year 2024. According to the 2026 Proxy, Corley received total compensation of $282,489 from the Company for fiscal year 2025.

24. The Company's 2026 Proxy provided the following information about Defendant Corley:

> **J. Andy Corley.** Mr. Corley has served as a member of our Board since January 2015 and has served as our Chairman of the Board of Directors since July 2015, as a member of the Compensation Committee since January 2015 and as a member of the Governance Committee since July 2021. Mr. Corley has also served as a board member of Newton Tech (formerly Neurolens) since 2012, where he currently serves as Chairman of the Board, and has been a partner at Flying L Partners since 2016. Mr. Corley also currently serves on the boards of directors for Epion Therapeutics, Nvasc, Inc., Surface Medical, and Lumenex. Mr. Corley co-founded eyeonics, Inc. in 1998 and served as its Chief Executive Officer and Chairman of the Board until the company was sold to Bausch & Lomb, Inc. in February 2008. Mr. Corley then served as President of the Surgical Division at Bausch & Lomb following its acquisition of eyeonics, Inc from 2008 to 2011. Mr. Corley also co-founded Chiron Vision Corp., a company focused on the development of LASIK, in 1987 and served as General Manager of the Refractive Surgery Division until December 1997. Mr. Corley received a Bachelor of Business Administration degree from Georgia Southern University.

> We believe Mr. Corley is qualified to serve on our Board because of his experience in leading and investing in medical device companies.

25. During the Relevant Period, and while in possession of material non-public information, Defendant Corley sold 14,000 shares of RxSight common stock, held through the Andy Corley Living Trust and the Juana McKay Living Trust (a trust for which his spouse serves as trustee), for proceeds of approximately $571,527.80.

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 12/14/2023 | $40.12 | 10,000 | $401,224.00 |
| 12/14/2023 | $40.12 | 2,000 | $80,245.20 |
| 01/08/2024 | $45.03 | 2,000 | $90,058.60 |
| **TOTAL** | | **14,000** | **$571,527.80** |

26. Defendant **William J. Link** ("Link") has served as a director of RxSight since November 2016. Link served on the Audit Committee from July 2021 to February 2024, including during the Relevant Period, and previously served on the Compensation Committee from November 2016 to July 2021. According to the 2025 Proxy, Link received total compensation of $201,195 from the Company for fiscal year 2024. According to the 2026 Proxy, Link received total compensation of $219,989 from the Company for fiscal year 2025. The Company concedes that Link is not independent under Nasdaq rules because of payments RxSight made to Praxis Management, LLC and related entities, in which a trust affiliated with Link is a significant investor and whose chief executive officer is Link's son-in-law. According to the Company's proxy statements, RxSight made rebate payments to the Praxis entities of approximately $641,000 in 2023, and rebate and commission payments of approximately $821,000 in 2024 and $838,600 in 2025.

27. The Company's 2026 Proxy provided the following information about Defendant Link:

> **William J. Link, Ph.D.** Dr. Link has served as a member of our Board since November 2016 and has served as a member of the Compensation Committee from November 2016 to July 2021 and as a member of the Audit Committee from July 2021 to February 2024. Dr. Link formed Flying L Management, LLC in 2017 and is the Managing Partner. Dr. Link has served as a managing director and cofounder of Versant Ventures Management LLC, a venture capital firm investing in early stage healthcare companies, since 1999. He has served as a member of the board of directors of Lensar, Inc. since November 2017 and Tarsus Pharmaceuticals, Inc. (NASDAQ: TARS) since January 2017. Dr. Link also currently serves on the board of directors of Allegro Ophthalmics, LLC, Praxis Management, LLC, Horizon Surgical, Forsight Vision 6, TearClear Corp., ViaLase, Inc., Osanni Bio, Inc., Eyexora, LLC, and EyeDura, Inc. Prior to co-founding Versant Ventures in November 1999. Dr. Link was a general partner at Brentwood Venture Capital from 1998 to 2020. From March 1986 to December 1997, Dr. Link was founder, chairman, and chief executive officer of Chiron Vision Corp. He also founded and served as President of American Medical Optics, Inc. (AMO) a division of American Hospital Supply Corporation, (acquired by Allergan, Inc., which was acquired by AbbVie (NYSE: ABBV) from 1978 to 1985. Dr. Link served as a director of Advanced Medical Optics, Inc. from September 2002 to February 2009, a director of Inogen, Inc. (NASDAQ:INGN) from July 2003 to February 2014, a director of Second Sight Medical Products, Inc. from August 2003 to May 2020, a director of Edwards Lifesciences Corp. (NYSE:EW) from May 2009 to May 2021, a director of Glaukos, Inc. (NYSE:GKOS) from June 2001 to December 2021, and a director of Oyster Point Pharma, Inc. (acquired by Viatris Inc. NASDAQ:VTRS) from July 2015 to March 2022. Dr. Link also served as an assistant professor in the Department of Surgery at the Indiana University School of Medicine from 1973 to 1976. Dr. Link received a B.S., M.S., and a Ph.D. in mechanical engineering from Purdue University.
>
> We believe Dr. Link is qualified to serve on our Board because of his experience in leading and investing in medical device companies.

28. During the Relevant Period, and while in possession of material non-public information, Defendant Link sold 28,250 shares of RxSight common stock, held through Link Family Enterprise, L.P., for proceeds of approximately $1,403,120.10.

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 02/01/2024 | $49.54 | 20,598 | $1,020,455.82 |
| 02/01/2024 | $50.01 | 7,652 | $382,664.28 |
| **TOTAL** | | **28,250** | **$1,403,120.10** |

29. Defendant **Juliet Tammenoms Bakker** ("Tammenoms Bakker") has served as a director of RxSight since June 2015. Tammenoms Bakker is a member of the Audit Committee and the Governance Committee, and served on the Audit Committee throughout the Relevant Period. She is a co-founder and Managing Director of Longitude Capital, a healthcare venture capital firm. According to the 2025 Proxy, Tammenoms Bakker received total compensation of $214,945 from the Company for fiscal year 2024. According to the 2026 Proxy, Tammenoms Bakker received total compensation of $234,989 from the Company for fiscal year 2025.

30. The Company's 2026 Proxy provided the following information about Defendant Tammenoms Bakker:

> **Juliet Tammenoms Bakker.** Ms. Tammenoms Bakker has served as a member of our Board since June 2015. Ms. Tammenoms Bakker co-founded Longitude Capital, a healthcare venture capital firm, where she has served as a Managing Director since 2006. Prior to Longitude, Ms. Tammenoms Bakker served as a Managing Director of Pequot Ventures, where she founded the life sciences investment practice. Prior to Pequot Ventures, Ms. Tammenoms Bakker was an equity research analyst with Banque Paribas. Ms. Tammenoms Bakker currently serves on the boards of directors of Ceribell, Inc. (NASDAQ: CBLL) and other privately held healthcare companies. Ms. Tammenoms Bakker previously served on the boards of directors of over twenty companies including Eargo, Inc. (NASDAQ: EAR), Axonics Modulation Technologies,

> Inc. (NASDAQ: AXNX), and Venus concept Inc. (NASDAQ: VERO). Ms. Tammenoms Bakker holds an M.P.A. from the Harvard Kennedy School and a B.Sc. from the College of Agriculture and Life Sciences at Cornell University, or CALS, and she currently serves as a Trustee on the Board of Trustees at Cornell University.
>
> We believe Ms. Tammenoms Bakker is qualified to serve on our Board due to her extensive experience as an investor in medical technology companies and as a member of the boards of directors of multiple public and private companies.

31. Less than three weeks into the Relevant Period, while Defendant Tammenoms Bakker sat on the Audit Committee, Longitude Venture Partners II, L.P. ("LVP II") sold its entire remaining RxSight stake, 994,313 shares, for approximately $28.3 million. Defendant Tammenoms Bakker is one of two managing members of LVP II's general partner, Longitude Capital Partners II, LLC, and may be deemed to share voting, investment and dispositive power over LVP II's shares. None of these sales was reported as made pursuant to a Rule 10b5-1 trading plan.

32. Defendant **Julie B. Andrews** ("Andrews") has served as a director of RxSight since August 2021 and has served throughout that time, including the Relevant Period, as Chair of the Audit Committee. The Board has designated Andrews as an "audit committee financial expert." According to the 2025 Proxy, Andrews received total compensation of $219,945 from the Company for fiscal year 2024. According to the 2026 Proxy, Andrews received total compensation of $239,989 from the Company for fiscal year 2025.

33. The Company's 2026 Proxy provided the following information about Defendant Andrews:

> **Julie B. Andrews.** Ms. Andrews has served as a member of our Board since August 2021, at which time she was nominated to serve as the Chairperson of the Audit Committee. Ms. Andrews has over twenty years' experience in senior finance leadership roles with leading

> medical technology companies and brings a broad skill set in executing strategic initiatives and leading global finance organizations. Ms. Andrews currently serves as the Chief Financial Officer for Orthofix Medical (NASDAQ: OFIX), a leading global medical technology company. Previously, Ms. Andrews served as the Chief Financial Officer for Smart Wires Technology LTD., a clean technology company focused on digitalizing and modernizing the electrical grid from September 2021 to April 2023. From August 2019 to December 2020, Ms. Andrews held the position of Senior Vice President, Global Finance with Wright Medical Group N.V. (NASDAQ: WMGI) with responsibility for the finance, accounting, tax and treasury functions. During her time at Wright Medical, Ms. Andrews played key leadership roles in several successful mergers and acquisitions. These included leading the divestiture and carve-out of the approximately $300 million sale of the hip and knee business to Microport, providing leadership oversight for Wright Medical's $3.3 billion in equity value acquisition of Tornier, N.V., and leading the diligence and integration planning of the sale of Wright Medical to Stryker Corporation (NYSE: SYK). Ms. Andrews was Vice President, Chief Accounting Officer from May 2012 to September 2019 of Wright Medical Group N.V. (f.k.a. Wright Medical Group Inc.). Prior to joining Wright Medical, Ms. Andrews spent fourteen years at Medtronic, Inc. (NYSE: MDT), a global medical device company. During her tenure with Medtronic, Ms. Andrews held numerous key financial positions including Vice President, Finance (Business Unit CFO) for the $3.5 billion Spine and Biologics business. Ms. Andrews began her career working with Thomas & Betts Corporation in Memphis, Tennessee and Thomas Havey, LLP in Chicago, Illinois. Ms. Andrews previously served on the board of directors of Priveterra (NASDAQ: PMGM), a healthcare focused special acquisition corporation and serves as the chair of their audit committee. Ms. Andrews received a BS in Accounting from Indiana University NW.
>
> We believe that Ms. Andrews is qualified to serve on our Board due to her financial experience in the healthcare industry.

34. During the Relevant Period, and while in possession of material non-public information, Defendant Andrews sold 15,625 shares of RxSight common stock for proceeds of approximately $906,288.14.

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 06/14/2024 | $57.84 | 11,940 | $690,608.41 |
| 06/14/2024 | $58.53 | 3,685 | $215,679.73 |
| **TOTAL** | | **15,625** | **$906,288.14** |

35. Defendant **Robert J. Palmisano** ("Palmisano") has served as a director of RxSight since August 2021, served as Chair of the Compensation Committee throughout the Relevant Period, and continues to serve in that role. According to the 2025 Proxy, Palmisano received total compensation of $214,945 from the Company for fiscal year 2024. According to the 2026 Proxy, Palmisano received total compensation of $234,989 from the Company for fiscal year 2025.

36. The Company's 2026 Proxy provided the following information about Defendant Palmisano:

> **Robert J. Palmisano.** Mr. Palmisano has served on our Board since August 2021, at which time he was nominated to serve as the Chairperson of the Compensation Committee. Mr. Palmisano served as President and Chief Executive Officer, and as the Executive Director of the Board of Directors and Board Member of Wright Medical Group N.V. in connection with the merger of Wright Medical Group, Inc. (NASDAQ: WMGI) and Tornier N.V. from October 2015 until it was acquired by Stryker Corporation (NYSE: SYK) in November 2020. Mr. Palmisano also served as President and Chief Executive Officer of Wright Medical Group, Inc. from September 2011 to October 2015, and President and Chief Executive Officer of ev3 Inc. from April 2008 to July 2010, when it was acquired by Covidien plc. Mr. Palmisano was President and Chief Executive Officer of IntraLase Corp. (NASDAQ: ILSE) from April 2003 to April 2007, when it was acquired by Advanced Medical Optics (NYSE: EYE), Inc. Before joining IntraLase, Mr. Palmisano was President and Chief Executive Officer of MacroChem Corporation (OTCBB: MCHM) from April 2001 to April 2003. Earlier in his career, he served as President and Chief Executive Officer of Summit Technology, Inc. (NASDAQ: BEAM) until it was acquired by Alcon, Inc. (NYSE: ALC). Mr. Palmisano currently serves on the board of directors of AEON Biopharma (NYSE: AEON) and Saluda Medical (ASX: SLD), and serves on the Providence College Board of Trustees Emeritus. Mr. Palmisano previously served as the Chairman of the Board

> of Avedro, Inc. (acquired by Glaukos, Inc. (NYSE: GKOS)), and on the board of directors of ev3 Inc. (NASDAQ: EVVV), Priveterra Acquisition Corp. (NASDAQ: PMGM), Osteotech, Inc. (NASDAQ: OSTE) (acquired by Medtronic, Inc. (NYSE: MDT)) and Abbott Medical Optics, Inc. (acquired by Johnson & Johnson (NYSE: JNJ)), all publicly held companies, and Bausch & Lomb, a privately held company. Mr. Palmisano holds a B.A. in Political Science from Providence College.
>
> We believe Mr. Palmisano is qualified to serve on our Board because of his extensive experience leading and serving on the Board of medical device companies.

37. Defendant **Robert Warner** ("Warner") has served as a director of RxSight since August 2021. Warner served as Chair of the Governance Committee and as a member of the Compensation Committee throughout the Relevant Period, and continues to serve in both roles. According to the 2025 Proxy, Warner received total compensation of $217,445 from the Company for fiscal year 2024. According to the 2026 Proxy, Warner received total compensation of $237,489 from the Company for fiscal year 2025.

38. The Company's 2026 Proxy provided the following information about Defendant Warner:

> **Robert Warner.** Mr. Warner has served as a member of our Board since August 2021, at which time he was nominated to serve as a member of the Compensation Committee and the chair of the Governance Committee. Mr. Warner served as President and General Manager of Alcon Vision Care Franchise Alcon Laboratories (NYSE: ALC) from August 2015 until February 2018. Prior to that, Mr. Warner served as President, U.S. and Canada, for Alcon from January 2012 to July 2015 and as President, Canada and Latin America, for Alcon from November 2010 to January 2012. From January 2005 to October 2010, Mr. Warner served in increasing positions of responsibility for Alcon. Mr. Warner was a member of the Alcon Executive Leadership Team for over 10 years and led the Alcon transition from Nestle (OTCMKTS: NSRGY) to Novartis (NYSE: NVS) majority ownership. Mr. Warner currently serves on the board of directors of Oculis (NASDAQ: OCS) and three private medical device companies, i Lumen Scientific, Qlaris Bio, and EyeYon Medical (serving as Chairman for the latter), and is also a

> board member of a nonprofit organization, GRACE, the Grapevine Relief and Community Exchange. Mr. Warner holds a B.S. in Chemistry from Pace University and an MBA from Rutgers University.
>
> We believe Mr. Warner is qualified to serve on our Board because of his extensive experience leading and serving on the Board of medical device companies.

39. During the Relevant Period, and while in possession of material non-public information, Defendant Warner sold 43,750 shares of RxSight common stock, held through the Cabo Living Trust, for proceeds of approximately $1,714,445.41.

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 12/08/2023 | $35.01 | 14,502 | $507,706.32 |
| 12/11/2023 | $35.08 | 5,498 | $192,845.10 |
| 01/08/2024 | $42.37 | 16,530 | $700,389.32 |
| 01/08/2024 | $43.42 | 7,220 | $313,504.67 |
| **TOTAL** | | **43,750** | **$1,714,445.41** |

40. Defendant **Shweta Singh Maniar** ("Maniar") has served as a director of RxSight since December 2021, served as a member of the Governance Committee throughout the Relevant Period. According to the 2025 Proxy, Maniar received total compensation of $204,945 from the Company for fiscal year 2024. According to the 2026 Proxy, Maniar received total compensation of $224,989 from the Company for fiscal year 2025.

41. The Company's 2026 Proxy provided the following information about Defendant Maniar:

> **Shweta Singh Maniar.** Ms. Maniar joined our Board in December 2021, at which time she was nominated to serve as a member of the Governance Committee. Since July 2018, Ms. Maniar has served as Global Leader, Healthcare & Life Sciences Solutions & Strategy at Google, where she leads vision, strategy, and execution of Google Cloud's industry product strategy and go-to-market model. Prior to joining Google (Alphabet, Inc.) (NASDAQ: GOOG), from November 2013 to June 2018, Ms. Maniar

> contributed as an executive at Genentech, where she led market growth strategies relevant to technology accelerators for therapies and diagnostics. For more than a year previously, she served as Director for the Center of Minimally Invasive Therapeutics at Summa Health. Earlier in her career, Ms. Maniar spent several years in a research capacity at the Cleveland Clinic and the Austen BioInnovation Institute in Akron, where she was primarily focused on medical devices and minimally invasive therapeutics. She currently serves on the board of directors of Orthofix Medical Inc. (NASDAQ: OFIX). Ms. Maniar holds a B.A. in Economics from the University of California, San Diego.
>
> We believe Ms. Maniar is qualified to serve on our Board because of her leadership experience and her business, operations and strategy experience with healthcare companies.

42. During the Relevant Period, and while in possession of material non-public information, Defendant Maniar sold 20,118 shares of RxSight common stock for proceeds of approximately $863,501.77.

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 01/08/2024 | $45.00 | 6,418 | $288,810.00 |
| 01/18/2024 | $45.69 | 3,520 | $160,811.55 |
| 01/18/2024 | $45.76 | 2,879 | $131,743.90 |
| 11/26/2024 | $45.88 | 3,782 | $173,518.16 |
| 01/22/2025 | $30.87 | 3,519 | $108,618.16 |
| **TOTAL** | | **20,118** | **$863,501.77** |

43. Defendant **Tamara R. Fountain** ("Fountain") has served as a director of RxSight since January 2022 and has served on the Audit Committee throughout that time, including the Relevant Period. According to the 2025 Proxy, Fountain received total compensation of $209,945 from the Company for fiscal year 2024. According to the 2026 Proxy, Fountain received total compensation of $229,989 from the Company for fiscal year 2025.

44. The Company's 2026 Proxy provided the following information about Defendant Fountain:

> **Tamara R. Fountain, M.D.** Dr. Fountain joined our Board in January 2022, at which time she was nominated to serve as a member of the Audit Committee. Dr. Fountain served as the 2021 President of the American Academy of Ophthalmology, the world's largest association of eye physicians and surgeons and recently returned to Academy service as Secretary for Global Relations in 2025. She also serves as an Associate Editor of Ophthalmology, the journal of the American Academy of Ophthalmology. Dr. Fountain was named to the board of directors of the American Board of Ophthalmology in January 2022, where she serves on the Finance and Credentialing Committees and chairs the Governance Committee. Dr. Fountain was elected to the board of Sight Sciences (NASDAQ: SGHT) in July 2022 where she serves on the Nominating-Governing and Compensation Committees. She has been on faculty at Rush University Medical Center in Chicago since May 1998 where she is professor of ophthalmology and section chair emeritus of ophthalmic plastic and reconstructive surgery. She has maintained a private practice, Ophthalmology Partners, Ltd., on Chicago's North Shore since December 2000. Dr. Fountain was chair for Alumni Fund Giving at Harvard Medical School from January 2016 to June 2019 and began a two-year term as President of the Harvard Medical School Alumni Council in 2026. She served as President of the American Society of Ophthalmic Plastic and Reconstructive Surgery in 2018 and 15 years on the board of directors of Ophthalmic Mutual Insurance Company (OMIC), the largest, by market share, professional liability insurer of ophthalmologists in the United States. At the end of her term, Dr. Fountain was elected OMIC's chair of the Board and chair of the Audit Committee, serving January 2014 to December 2015. She was President of the Illinois Society of Eye Physicians and Surgeons January 2002 to December 2005. Dr. Fountain received her BA in Human Biology from Stanford University in 1984, her MD from Harvard Medical School in 1988 and in 1992, completed her residency in ophthalmology at Johns Hopkins Hospital's Wilmer Eye Institute.
>
> We believe Dr. Fountain is qualified to serve on the Board because of her experience as a practicing ophthalmologist and her leadership roles in the ophthalmology field.

45. During the Relevant Period, and while in possession of material non-public information, Defendant Fountain sold 7,000 shares of RxSight common stock for proceeds of approximately $180,001.50.

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 03/12/2025 | $25.71 | 7,000 | $180,001.50 |
| **TOTAL** | | **7,000** | **$180,001.50** |

46. Defendants Kurtz, Corley, Link, Tammenoms Bakker, Andrews, Palmisano, Warner, Maniar, and Fountain are referred to herein as the "Director Defendants." Defendants Kurtz and Thunen are referred to herein as the "Officer Defendants." Defendants Kurtz, Thunen, Corley, Link, Andrews, Warner, Maniar, and Fountain are referred to herein as the "Insider Selling Defendants."

***Relevant Non-Parties***

47. Non-party **Aziz Mottiwala** ("Mottiwala") was appointed RxSight's President and CEO, and a director, effective July 20, 2026, filling the vacancy created by Defendant Kurtz's resignation from the Board. From August 2020 to July 2026, Mottiwala served as Chief Commercial Officer of Tarsus Pharmaceuticals, Inc., on whose board of directors Defendant Link has served since January 2017.

48. Non-parties Eric Weinberg and Ilya Goldshleger are RxSight senior executives who, during the Relevant Period, served as Co-Presidents of the Company together with Defendant Thunen beginning in July 2024. During the Relevant Period, Weinberg sold 50,000 shares of RxSight common stock for proceeds of approximately $2,260,120.68, and Goldshleger sold 166,861 shares for proceeds of approximately $8,015,386.05.

49. During the Relevant Period, the Individual Defendants were actively engaged in managing the Company's operations at the highest levels and had access to confidential and proprietary information related to the Company's business, operations, LAL and LDD sales, customer adoption and utilization, and future business prospects. They also participated in drafting, producing, reviewing, and disseminating the allegedly false and misleading statements detailed herein. Furthermore, they were either aware of or recklessly disregarded the inaccuracies

and misrepresentations made about the Company through public statements, representations, and filings, and either approved or ratified these statements actively, or through inaction, thereby violating the federal securities laws and their fiduciary duties to RxSight.

50. As officers and controlling persons of a publicly traded company whose securities are registered with the SEC under the Exchange Act and listed on Nasdaq, the Individual Defendants had a duty to promptly disclose truthful, accurate, and complete information regarding the Company's products, customer adoption and utilization, and current and future business prospects. They were also obligated to correct any prior statements that were materially false or misleading to ensure that the market price of the Company's publicly traded shares reflected truthful, accurate, and complete information. The Individual Defendants' false and misleading representations and omissions during the Relevant Period constituted a violation of these specific duties and obligations.

51. The Individual Defendants, by virtue of their positions of control and authority as officers and directors of the Company, exercised control over the content of the Company's SEC filings, press releases, and other public statements issued during the Relevant Period. Each Individual Defendant received copies of, or participated in preparing, the documents alleged to be false and misleading before or shortly after their publication, and had the ability and opportunity to prevent their issuance or ensure their correction. As a result, each Individual Defendant bears responsibility for the accuracy of the public statements described herein.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52. By reason of their positions as officers, directors, and/or fiduciaries of RxSight, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed RxSight and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. The Individual

Defendants were and are required to use their utmost ability to control and manage RxSight in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of RxSight and its shareholders to benefit all shareholders equitably.

53. Each director and officer of the Company owes RxSight and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

54. As fiduciaries of RxSight, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

55. The officers and directors of RxSight were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

56. Each Individual Defendant, in their position as officers and directors of RxSight, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

57. As RxSight's directors and officers, the Individual Defendants knowingly or recklessly disregarded their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

58. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the efficacy of the Company's products, customer adoption and utilization, financial condition, performance, growth, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

59. As fiduciaries, the Individual Defendants had a duty to disclose in the Company's regulatory filings with the SEC all events described in this Complaint that the Company failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

60. The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a. ensure the Company's affairs were managed efficiently and in a business-like manner to achieve the highest quality performance;

b. ensure that the Company operated diligently, honestly, and prudently, in full compliance with all applicable federal and state laws, rules, regulations, and contractual obligations, and acted strictly within its legal authority;

c. ensure that communications with the public and shareholders were timely, complete, and made with candor; and

d. upon notice of issues concerning the Company's business practices or operations, act in good faith to take appropriate measures to correct the misconduct and prevent its recurrence.

61. Each of the Individual Defendants also bore a duty of loyalty to RxSight and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

62. During the pertinent times, the Individual Defendants served as agents for each other and for RxSight, always operating within the parameters of their agency.

63. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within RxSight, were privy to detrimental, confidential information concerning the Company, including the internal LAL and LDD sales reports, "Study Patient" customer service data, Doctor Readiness reports, and sales-call and Town Hall discussions described herein.

**RxSight's Code of Business Conduct and Ethics**

64. In addition to the fiduciary duties enumerated above, the Individual Defendants, like all directors, officers, and employees of the Company, are required to comply with RxSight's Code of Business Conduct and Ethics (the "Code of Conduct"). In its "Purpose" section, the Code of Conduct provides:

> This Code of Business Conduct and Ethics (this "Code") is designed to deter wrongdoing and to promote:
>
> 1. fair and accurate financial reporting;
> 2. compliance with applicable laws, rules and regulations including, without limitation, full, fair, accurate, timely and understandable disclosure in reports and documents the Company files with, or submit to, the U.S. Securities and Exchange Commission and in the Company's other public communications;
> 3. the prompt internal reporting of violations of this Code as set forth in this Code;
> 4. honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest; and
> 5. a culture of honesty and accountability.
>
> This Code applies to all directors, officers and employees (who, unless otherwise specified, will be referred to jointly as "employees") of RxSight, Inc. (together with any subsidiaries, collectively the "Company"), as well as Company contractors, consultants and agents. This Code

> amends and restates any prior Code previously adopted by the Company.

65. Under the heading "Financial Reports and Other Records – Disclosure," the Code of Conduct states:

> Employees are responsible for the accurate and complete reporting of financial information within their respective areas and for the timely notification to senior management of financial and non-financial information that may be material to the Company to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.
>
> Each employee involved in the Company's disclosure process must familiarize themselves with the disclosure requirements applicable to the Company and the business and financial operations of the Company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.
>
> Employees must maintain all of the Company's books, records, accounts and financial statements in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely. Furthermore, employees must ensure that all books, records, accounts and financial statements conform both to applicable legal requirements and to the Company's system of internal controls. Employees must carefully and properly account for all assets of the Company. Employees may not establish any undisclosed or unrecorded account or fund for any purpose. Employees shall not make any false or misleading entries in the Company's books or records for any reason, or disburse any corporate funds or other corporate property without adequate supporting documentation and authorization. Employees shall not misclassify transactions related to accounts, business units or accounting periods. Each employee bears responsibility for ensuring that they are not party to a false or misleading accounting entry.

66. Under the heading "Conflicts of Interest," the Code of Conduct states:

> You must act and behave in the Company's best interests and not based on personal relationships or benefits. You should avoid situations where your personal activities and

> relationships conflict, or appear to conflict, with the Company's interests. Examples of conflicts of interest may include transactions with family members, interests in other businesses, gifts or gratuities and personal use of Company assets.
>
> Evaluating whether a conflict of interest exists can be difficult and may involve a number of considerations. Employees should seek guidance from their manager, the Compliance Officer or Human Resources when they have any questions or doubts.
>
> If an employee is aware of an actual or potential conflict of interest where their interests may conflict with the Company's interests, or is concerned that a conflict might develop, they should discuss with their manager, the Compliance Officer or Human Resources and then obtain approval from the Compliance Officer before engaging in that activity or accepting something of value.
>
> If a director is aware of an actual or potential conflict of interest where their interests may conflict with the Company's interests, or is concerned that a conflict might develop, they should discuss with the Audit Committee and then obtain approval from the Audit Committee before engaging in that activity or accepting something of value.

67. Under the heading "Fair Dealing," the Code of Conduct states:

> The Company does not seek competitive advantages through illegal or unethical business practices. Each employee should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors, business partners and employees. No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any unfair dealing or practice.

68. Under the heading "Compliance with Laws, Rules and Regulations," the Code of Conduct states, in part:

> All employees must respect and obey all laws when carrying out responsibilities on behalf of the Company and refrain from illegal conduct.
>
> Employees have an obligation to be knowledgeable about specific laws, rules and regulations that apply to their areas of responsibility. If a law conflicts with a policy in this Code, employees must comply with the law.

69. Regarding insider trading, the Code of Conduct states:

> 5. Insider Trading. Under federal and state securities laws, it is illegal to trade in the securities of a company while in possession of material non-public information about that company. Because employees will have knowledge of specific confidential information that is not disclosed outside the Company which will constitute material nonpublic information, trading in the Company's securities or in the securities of those companies with which the Company does business by employees or persons employees provide material nonpublic information to could constitute insider trading, violating the law. It is an employee's responsibility to comply with these laws and not to share material nonpublic information.

70. Regarding the Audit Committee, the Code of Conduct states:

> 10. Keeping the Audit Committee Informed. The Audit Committee plays an important role in ensuring the integrity of the Company's public reports. If an employee believes that questionable accounting or auditing conduct or practices have occurred or are occurring, they should notify the Audit Committee of the Board of Directors. In particular, any employee should promptly bring to the attention of the Audit Committee any information of which they may become aware concerning:
>
> a. the accuracy of material disclosures made by the Company in its public filings;
>
> b. material weaknesses or significant deficiencies in internal control over financial reporting;
>
> c. any evidence of fraud that involves an employee who has a significant role in the Company's financial reporting, disclosures or internal controls or procedures; or
>
> d. any evidence of a material violation of the policies in this Code regarding financial reporting.

71. Regarding sanctions for violations, the Code of Conduct states:

> 4. Sanctions. Employees who violate this Code may be subject to disciplinary action, up to and including termination of employment. Moreover, employees who direct or approve of any conduct in violation of this Code, or who have knowledge of such conduct but do not immediately report it may also be subject to disciplinary

> action, up to and including termination of employment. A director who violates this Code or directs or approves conduct in violation of this Code shall be subject to action as determined by the Board or an applicable committee of the Board.

**<u>RxSight's Corporate Governance Guidelines</u>**

72. In addition to the duties above, each of the Director Defendants was bound by the Company's Corporate Governance Guidelines (the "Governance Guidelines"), which the Board adopted on July 1, 2021, effective as of the Company's initial public offering. The Governance Guidelines describe the Board's role as follows:

> Role. The Board's principal duty is to exercise its powers in accordance with its fiduciary duties to the Company and in a manner it reasonably believes to be in the best interests of the Company and its stockholders. It is also the Board's duty to oversee senior management in the competent and ethical operation of the Company. To satisfy this responsibility, the Board expects its members to take a proactive approach to their duties and function as active monitors of corporate management. Accordingly, the directors provide oversight in the formulation of the long-term strategic, financial and organizational goals of the Company and of the plans designed to achieve those goals. In addition, the Board reviews and approves Company standards and policies to ensure that management carries out their day-to-day operational duties in a competent and ethical manner and consistent with high standards of responsible conduct and ethics.

73. The Governance Guidelines further require directors to avoid conflicts of interest, to report them to the Audit Committee, and to recuse themselves from matters in which they have a personal interest:

> Conflicts of Interest. Directors are expected to avoid any action, position or interest that conflicts with the interests of the Company or gives the appearance of a conflict. If an actual or potential conflict of interest develops, including any "related person transaction," the director will report all facts regarding the matter to the chairperson of the Audit Committee, or if such director is the chairperson of the Audit Committee, then to the other members of the Audit Committee. Any material conflict must be resolved or the director should resign. If a director has a personal interest in a matter before the Board, the director must disclose the interest to the Board and excuse himself or herself from discussion of the matter and abstain from voting on the matter.
>
> The Audit Committee will periodically review and approve the Company's Code of Business Conduct and Ethics, which is applicable to the Company's directors, officers, employees, contractors, consultants and agents. The Audit Committee will report material related person transactions to the full Board and review and approve the Company's procedures for handling complaints regarding accounting or auditing matters.

74. The Governance Guidelines also require directors to report circumstances that may reflect adversely on the Company:

> Directors Who Become Aware of Circumstances that May Adversely Reflect Upon the Director or the Company. When a director, including any director who is currently an officer or employee of the Company, becomes aware of circumstances that may adversely reflect upon the director, any other director, or the Company, the director should notify the Governance Committee of such circumstances. The Governance Committee will consider the circumstances and may in certain cases request the director to cease the related activity or, in more severe cases, request that the director submit his or her resignation from the Board.

75. In addition, the Governance Guidelines provide that "[t]he basic duties of the directors include being prepared for and attending Board meetings and actively participating in Board discussions," and that directors are expected "to invest the time and effort necessary to understand the Company's business and financial strategies and challenges." To that end, the Governance Guidelines guarantee the Board and its directors "direct, independent and confidential access to the Company's executive officers, management and personnel to carry out the Board's purposes and fulfill its duties."

76. The Director Defendants breached the duties set forth in the Governance Guidelines. Rather than "function[ing] as active monitors of corporate management," the Director Defendants failed to oversee senior management's dissemination of the false and misleading statements described herein regarding the adoption and utilization of the RxSight System, notwithstanding their "direct, independent and confidential access" to the Company's management and personnel, and to the internal sales reports, customer service data, and Doctor Readiness reports documenting slowing adoption and flat or declining utilization. By virtue of the misconduct alleged herein, the Director Defendants violated the Governance Guidelines.

**<u>RxSight's Audit Committee Charter</u>**

77. In addition to the duties above, under the Company's Amended and Restated Audit Committee Charter, as amended and restated on December 14, 2023 (the "Charter"), as members of the Audit Committee during the Relevant Period, Defendants Andrews (Chair), Tammenoms Bakker, Fountain, and Link (through February 2024) (collectively, the "Audit Committee Defendants") owed specific additional duties to RxSight. The Charter states that the purpose of the Audit Committee is as follows:

> The purpose of the Committee shall be to assist the Board in its oversight of:
>
> - the accounting and financial reporting processes and internal controls of the Company;
> - the audit and integrity of the Company's financial statements;
> - the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);
> - the qualifications, independence and performance of the Company's independent auditors; and
> - the implementation and performance of the Company's internal audit function, if applicable.
>
> The Committee shall also be responsible for preparing the report required by the Securities and Exchange Commission (the "SEC") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing other duties and responsibilities as are enumerated in or consistent with this charter.

78. Among the Audit Committee's enumerated responsibilities, the Charter provides:

> <u>Review of Internal Controls and Integrity of Financial Statements</u>. The Committee shall periodically meet with management, the internal audit function, if applicable, and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's audited financial statements. Included in this process shall be review of:
>
> - the scope and timing of the annual audit of the Company's financial statements;
> - the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of

Operations" should be included in the Company's Form 10-K for filing with the SEC;

- the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;
- the quality and adequacy of the Company's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;
- the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;
- any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;
- any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;
- the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and
- any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management.

* * *

<u>Review of Financial Information Presentation, Earnings Press Releases and Guidance</u>. The Committee shall periodically discuss with management the Company's procedures with respect to the presentation of the Company's financial information (paying attention to any use of "pro forma" or "adjusted" non-GAAP information) and review earnings press releases, earnings guidance

provided to analysts and rating agencies and financial information provided to the public, analysts and ratings agencies. The Chairperson of the Committee may represent the entire Committee for the purposes of such discussions.

* * *

Related Party Transactions. The Committee shall review, approve and monitor related party transactions involving directors or executive officers as further detailed in the Company's Related Person Transactions Policy, including the development and maintenance of policies and procedures for the Committee's review, approval and/or ratification of such transactions.

Conflicts of Interest. The Committee shall review and monitor compliance with the Company's Code of Business Conduct and Ethics and consider questions of actual or possible conflicts of interest of Board members and of corporate officers and approve or prohibit applicable transactions or matters.

* * *

Compliance with Laws. On at least an annual basis, the Committee shall review and discuss with management and the independent auditor (a) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (b) reports regarding compliance with applicable laws, regulations and internal compliance programs. The Committee must discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any reports or complaints that raise material issues regarding the Company's financial statements or policies. The Committee must discuss with the Company's Chief Financial Officer and/or General Counsel (if one is serving) any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

Enterprise Risk Management. The Committee shall review and discuss with management, including the Company's internal audit function, if applicable, and the Company's independent auditor guidelines and policies to identify, monitor, and address enterprise risks, including those risks related to cybersecurity. This shall include discussion of the Company's major financial risk

> exposures and the steps management has taken to monitor and control such exposures. The Committee shall also oversee and monitor management's plans to address such risks. In connection with its review of enterprise risk, management's assessment thereof and any draft risk factors presented by management, the Committee is entitled to rely on management's identification and assessment of the operational, financial, strategic, regulatory and other risks described.
>
> * * *
>
> Report to Full Board. The Committee must review with the full Board any issues that arise regarding: (a) the quality or integrity of the Company's financial statements; (b) the Company's compliance with legal or regulatory requirements; (c) the performance and independence of the Company's independent auditor; and (d) the performance of the internal audit function, if applicable.

79. The Audit Committee Defendants, as members of the Audit Committee specifically and expressly charged, under the language of the Charter quoted above, with reviewing the Company's Forms 10-K and 10-Q (including the MD&A disclosures), earnings press releases, and earnings guidance, and with discussing the Company's enterprise risks and risk management policies, were directly responsible for overseeing the integrity of the very adoption, utilization, and guidance disclosures that form the basis of this action. Each of the Audit Committee Defendants breached these committee-specific obligations by failing to ensure that RxSight's internal controls and disclosure controls surfaced and corrected the false and misleading statements described herein, notwithstanding the Company's own internal sales reports, customer service data, and Doctor Readiness reports documenting slowing adoption and flat or declining utilization.

80. By virtue of the misconduct alleged herein, the Individual Defendants violated the Code of Conduct; as to the Director Defendants, the Governance Guidelines; and, as to the Audit Committee Defendants, the Audit Committee Charter.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81. In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this Complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

82. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

83. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

84. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, the Individual Defendants, as officers and/or directors of RxSight, were direct, essential, and significant participants, collectively and individually, in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this Complaint.

85. Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed

to the commission of that wrongdoing, and was, or should have been, aware of his or her overall role in furthering the misconduct.

86. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of RxSight, and at all times operated within the course and scope of that agency.

## FACTUAL BACKGROUND

***Cataract Surgery, Premium Lenses, and the RxSight System***

87. A cataract is a clouding of the eye's natural lens that, left untreated, can cause blindness. Cataract surgery removes the clouded lens and replaces it with an artificial intraocular lens ("IOL"). Conventional IOLs are monofocal: they provide vision at a single fixed distance, typically leave patients needing glasses, and are generally covered by Medicare or private insurance. Premium IOLs, for which patients typically pay an additional $2,000 to $5,000 per eye out of pocket, aim to deliver better results, such as vision at multiple distances or correction of astigmatism, but premium multifocal lenses frequently cause side effects such as glare and halos. Premium IOL procedures account for roughly one-fifth of the cataract surgeries performed in the United States.

88. The RxSight System, approved by the FDA in 2017 and commercialized in the United States beginning in 2019, is designed to let a physician adjust a patient's vision after surgery. The surgeon first implants an LAL in a standard cataract procedure. Two to four weeks later, the patient returns for an eye exam, and the physician uses ultraviolet light from the LDD to reshape the implanted LAL. Patients may return for up to three adjustments, after which the lens is "locked in" in up to two more visits.

89. RxSight follows a "razor/razor-blade" model. It sells LDDs to practices at an average selling price of approximately $130,000, then seeks to drive recurring, high-margin LAL sales into that installed base at approximately $1,000 per lens.

Unlike conventional IOLs, the RxSight System requires each practice to make a capital investment in an LDD and to train its surgeons and staff to perform adjustments. Successful adoption and continued utilization therefore depend heavily on field support from RxSight's account managers, sales representatives, clinical application specialists, and technical service personnel.

90. The RxSight System was the Company's sole product line and represented nearly all of its business. RxSight measured "utilization" as LAL procedures per LDD per month, calculated by dividing a quarter's LAL procedures by the LDD installed base at the end of the prior quarter, divided by three. RxSight did not report utilization in its SEC filings but discussed it on conference calls, and analysts treated it as a key indicator of RxSight's market penetration. The Company grouped each year's new customers into "cohorts" and repeatedly described to investors how each cohort's utilization was trending.

***The Undisclosed Problems with the RxSight System***

91. By late 2023, surgeons using LALs in ordinary clinical practice, rather than in tightly controlled clinical trials with carefully selected subjects, were finding that most patients still required reading glasses for near vision and that many LAL+ patients complained of waxy vision, glare, and halos. LALs were proving to be a niche product, most effective for former LASIK patients or when implanted by LASIK surgeons, who together represent a small fraction of cataract procedures.

92. Surgeons also found the post-operative process to be far more burdensome than represented. Adjustments and lock-ins could require up to five additional clinical hours per LAL patient, often with an additional physician or optometrist, which disrupted clinic workflow, reduced practice profitability, and made LALs less economical than competing premium procedures, and far more costly than conventional IOLs that were free to patients through insurance.

93. As a result, by mid-2023 RxSight had saturated its core market of LASIK and high-volume surgeons; utilization among earlier cohorts was flat; and newer cohorts were adopting the technology more slowly as knowledge of its limitations spread through the ophthalmology community. RxSight also lacked adequate field support in 2024 and 2025 to drive adoption and utilization, which compounded these undisclosed trends.

94. These facts were known to, or recklessly disregarded by, the Individual Defendants. Physicians complained regularly during 2023 through 2025 about LAL results, performance, and limited use cases on the ASCRS Ad Board, a chat log available only to the medical community that included Defendant Kurtz, himself a surgeon. Physician and clinician complaints were also recorded in “Study Patient” customer service data, in Customer Service Reports distributed to management, including Defendants Kurtz and Thunen, and in Doctor Readiness reports sent to Defendant Kurtz and other senior managers, and were discussed on weekly and monthly sales calls, Town Hall meetings, Team Meetings, and regular Zoom and conference calls that Defendants Kurtz and Thunen attended or participated in.

95. In 2024, RxSight also initiated a reward program called “Study Patient” for its larger clients, under which clients received a $500 rebate per eye for each LDD adjustment, and $20,000 was allotted to the physician after 40 eye adjustments. The program incentivized surgeons and clinics to use LALs in greater volumes than they otherwise would have, temporarily propping up revenues and adoption metrics and masking customer dissatisfaction.

96. Defendants Kurtz and Thunen repeatedly held themselves out as closely tracking this very data. For example, at the JPMorgan Healthcare Conference on January 10, 2024, Defendant Thunen stated: “We look at from a more macro viewpoint is the cohort of LDD on sales. So we look at the customers that were installed in 2020, 2021, ‘22 and ‘23.” At the Bank of America Health Care

Conference on May 15, 2024, Defendant Kurtz stated: "[A]s you can kind of tell, we survey and we're very close to our customers. And we are always taking their feedback." At the Morgan Stanley Global Healthcare Conference on September 4, 2024, Defendant Kurtz stated: "We do a survey – customer survey every year. We've done it now for about three years. And in that survey, we ask doctors and optometrists and practice managers where the patients are coming from."

## FALSE AND MISLEADING STATEMENTS

97. Throughout the Relevant Period, the Individual Defendants caused RxSight to misrepresent, and to omit material facts concerning: (1) the clinical results LALs actually delivered in real-world practice, including whether patients could see without glasses and avoid glare and halos; (2) the economic benefits and clinical burdens the RxSight System imposed on surgeons and practices; and (3) the true trajectory of adoption and utilization, including whether every customer cohort was growing and whether newer cohorts were adopting faster than older ones.

***November 2023 Through March 2024***

98. On November 9, 2023, the first day of the Relevant Period, RxSight issued a press release announcing its third quarter 2023 results, which quoted Defendant Kurtz as stating: "The post-operative adjustability of the LAL sets it apart from any other premium lens on the market today and makes it an increasingly popular choice for the precise, high-quality vision it provides across a range of distances."

99. On the earnings call held the same day, Defendant Kurtz stated:

> "[R]eal-world clinical data on 738 bilateral LAL subjects from nearly 80 clinical sites . . . continues to illustrate the clear advantages of postoperative adjustability. . . . 91% of LAL subjects achieved uncorrected binocular near vision of J2 or better, which means they could read 5-point type without glasses, while 79% could read at J1 or better[,] equivalent to 4-point type."
>
> "The results showed that 97% of blended vision LAL patients achieved 20/20 or better uncorrected distance

> vision and 95% achieve[d] J2 or better uncorrected near vision."

100. On January 10, 2024, at the JPMorgan Healthcare Conference, Defendant Kurtz stated:

> Based on our Phase 3 and Phase 4 studies, approximately twice the number of eyes will achieve 20/20 vision or better without glasses using the LAL, and about 90% of patients will see 20/20 or better at distance, and be able to read small fonts without glasses using both eyes.

101. On February 28, 2024, on the Company's fourth quarter 2023 earnings call, Defendant Kurtz stated:

> "With both the LAL and LAL+, doctors treat the actual refraction that is measured post-operatively, rather than trying to predict a result pre-operatively for the first time, achieving LASIK-level refractive results after cataract surgery."
>
> "We see again in our registry data that it's – over – approximately 90% of patients are seeing 20/20 at distance and able to read J2 at near, which is about 5.5, so it's a size of the footnote on a page."

102. On March 13, 2024, at the Oppenheimer Healthcare MedTech & Services Conference, Defendant Kurtz stated:

> "Because the Light Adjustable Lens is adjustable, it means that we can attain much higher refractive outcomes, better vision without glasses. We maintain very high quality of vision and we allow the patient to customize their vision, typically in both eyes."
>
> "[W]e correct vision with the same – at the same level of precision as glasses or contact lenses."

103. These statements were materially false and misleading because the Individual Defendants knew or recklessly disregarded that: (i) the clinical outcomes Defendants touted were drawn from controlled studies and selected data, with

subjects chosen under strict inclusion and exclusion criteria, that did not reflect what surgeons and patients were experiencing in ordinary practice, where most LAL patients still required reading glasses for near vision and did not obtain glasses-free vision, a reality that had become apparent by late 2023; (ii) LALs were not more effective for near vision than standard IOLs that were free to patients or covered by Medicare or insurance, which made LALs uncompetitive given their substantially higher cost; (iii) physicians regularly complained to RxSight about LAL results, performance, and limited use cases, including on the ASCRS Ad Board, and those complaints were recorded in "Study Patient" customer service data, Customer Service Reports, and Doctor Readiness reports provided to senior management and discussed on regular internal sales calls and meetings; (iv) LALs were a niche product that worked best for former LASIK patients or when implanted by LASIK surgeons, who represent only a small fraction of cataract patients and surgeons, and by mid-2023 RxSight had saturated its core LASIK and high-volume surgeon market; and (v) as a result, by mid-2023 RxSight was experiencing slowing adoption.

***April 2024 Proxy Statement***

104. On April 25, 2024, RxSight filed its Proxy Statement with the SEC on Schedule 14A (the "2024 Proxy"), which solicited shareholder votes to, among other things, re-elect Defendants Andrews, Palmisano, and Fountain to the Board and to approve, on an advisory basis, the compensation of the Company's named executive officers. At the June 6, 2024 annual meeting, shareholders re-elected Defendants Andrews, Palmisano, and Fountain. The 2024 Proxy assured shareholders that the Board was actively overseeing the Company's risks:

> Role of the Board in risk oversight
>
> Our Board has an active role, as a whole and also at the committee level, in overseeing the management of our

> risks. Our Board of Directors is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks and operational risks. The Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. The Audit Committee is responsible for overseeing the management of risks relating to accounting matters, financial reporting, internal controls over financial reporting, and cybersecurity. Our Governance Committee assists our Board in fulfilling its oversight responsibilities with respect to the management of risk associated with Board organization, composition, membership and structure, corporate governance and board performance. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed through discussions from committee members about such risks. Our Board believes its administration of its risk oversight function has not negatively affected our Board's leadership structure.

105. This statement was materially false and misleading because the Board was not effectively overseeing the Company's operational and disclosure risks. To the contrary, the Board permitted the Company to make the false and misleading statements alleged herein while failing to disclose that newer customers were adopting more slowly than earlier customers and older customers' utilization was flat, that physicians were regularly complaining to RxSight about LAL results, performance, and limited use cases, and that the clinical outcomes the Company touted did not reflect ordinary clinical practice.

***May and June 2024***

106. On May 6, 2024, on the Company's first quarter 2024 earnings call, Defendant Kurtz stated, regarding data on approximately 1,000 bilaterally implanted LAL subjects: "Approximately 90% of LAL patients attained binocular and corrected vision of 20/20 or better, while over 90% were able to read J2 or 5.5 with both eyes."

107. On May 13, 2024, RxSight announced the completion of a public offering of over 2 million shares of common stock at $56 per share, for proceeds of

approximately $115 million, conducted pursuant to a May 8, 2024 Registration Statement and Prospectus Supplement (the "Offering Materials"). The Offering Materials stated:

> "Most LAL patients choose minor differences in the refractive correction of each eye, resulting in glasses-free vision across a full range of distances."
>
> "In addition, over 90% of patients were also able to read 5-point font at near vision, which is typically the size of footnotes on a page."
>
> "We believe competitive premium IOLs often fail to deliver on patients' expectations for quality vision across a range of distances without glasses. We believe our RxSight system offers doctors and patients a significantly more reliable approach that can consistently deliver optimal, fully customized visual outcomes with few compromises, ultimately driving broad adoption and establishing it as the standard of care for premium cataract procedures."
>
> "LAL patients do not experience increased incidence of glare or halos that are common with other premium IOLs."

108. On May 15, 2024, at the Bank of America Health Care Conference, Defendant Kurtz stated: "We've seen steady increase in visibility and adoption of the technology and I think that what we saw in Q1 was more of the same." That same day, RxSight's stock price reached its Relevant Period high of $64.29 per share.

109. On June 18, 2024, at the Truist Securities MedTech Conference, Defendant Thunen stated:

> I look at our installed customers in 2020, 2021, 2022, 2023. . . . And I look at the number of LALs per LDD per month, right? . . . And what I see is all the [c]lasses [cohorts] end up at relatively the same position of LALs per LDD, and they're all growing.
>
> The other thing that is good about this data, as far as we're concerned, is the slope of line is steeper in our 2022 and 2023 [c]lasses than in the early [c]lasses.

110. At the same conference, when asked how many adjustments were needed per patient, Defendant Thunen stated: "It's been running about 1.6, which is the same as our PMA trial. And then, of course, they have two lock-ins."

111. These statements were materially false and misleading because the Individual Defendants knew or recklessly disregarded that: (i) the clinical outcomes Defendants touted were drawn from controlled studies and selected data that did not reflect ordinary clinical practice, where most LAL patients still required reading glasses for near vision and did not obtain glasses-free vision across a full range of distances; (ii) the LAL+, introduced in April 2024 with very little supporting data, produced glare and halos similar to other premium lenses, was difficult to position effectively, and drew heavily negative physician commentary that made the product difficult to sell; (iii) the RxSight System imposed significant burdens on practices, requiring up to five additional clinical hours per LAL patient to complete adjustments and lock-ins, which reduced practice profitability and depressed adoption and use; (iv) adoption was not steadily increasing and the cohorts were not all growing; rather, newer customers were adopting more slowly than earlier customers, and older customers' utilization was flat; and (v) RxSight's "Study Patient" rebate program temporarily inflated LAL volumes by paying larger clients for each adjustment, masking the underlying dissatisfaction and deterioration in demand. In addition, physicians had told Defendant Thunen that, in real-world use, LALs usually required three adjustments per patient in addition to two lock-ins, consuming as much as five hours of clinical time per LAL patient.

***The July 2024 Partial Disclosure and the August and September 2024 Statements***

112. On July 10, 2024, Wells Fargo Securities, LLC published the results of its own survey of 50 cataract surgeons, many of whom reported that they had no plans to adopt RxSight's technology because it increased costs without meaningfully

improving outcomes and was inefficient, costly for patients, and time-consuming. RxSight's stock price fell from $56.99 per share on July 9, 2024 to $51.11 per share on July 10, 2024.

113. Rather than disclose the truth, the Individual Defendants sought to reassure the market. On August 5, 2024, on the Company's second quarter 2024 earnings call, when asked about "investor concerns after some conflicting sell side research on . . . the ability to grow on LDD and LAL adoption," Defendants Kurtz and Thunen stated:

> "[Kurtz:] I'm not sure qualitatively that there's a large difference. We're still at the early phase of penetration of the market. And so we have – our new customers are similar to our previous customers that we continue to grow into the market."
>
> "[Thunen:] As we move to LAL adoption, I think that, as you [noted] earlier, we have talked about adoption by different cohorts of installs. And certainly those folks in '23 and '24 have accelerated faster. But the important thing with that number also is that we have continued to see all cohorts continue to grow. And we think an important part of the component of newer customers getting going faster, obviously is one, we have more references."

114. On the same call, Defendants also stated:

> "And part of that is, one, adding procedures from new customers, having them accelerate a little bit more rapidly than we had customers do in '20, '21, '22. And we started seeing that for customers installed in '23 and again in '24."
>
> "[P]articularly when we look at our cohorts – as we've talked about multiple times, that our cohort is the one I look at is based upon year of install. And those cohorts continue to grow. . . . And then, of course, the slope of the line in terms of adoption is higher for our newer customers. And if we think about it overall that the most important thing we do with the LAL is continue to get adoption. . . . But overall, the slope of the line is up and that's what we're working with."

115. RxSight's stock price rose from $40.78 per share on August 5, 2024 to $47.85 per share on August 6, 2024, and climbed to over $56 per share by the end of August 2024.

116. On September 4, 2024, at the Morgan Stanley Global Healthcare Conference, in response to a question about utilization among newer physicians relative to first-generation adopters, Defendant Thunen stated: "But what we have seen in our cohorts is all the cohorts continue to grow. . . . [W]e've seen an overall upward [utilization] trend consistently over the last year, two-and-a-half, three years."

117. These statements were materially false and misleading because the Individual Defendants knew or recklessly disregarded that: (i) LALs were a niche product that worked best for former LASIK patients or when implanted by LASIK surgeons, who represent only a small fraction of cataract patients and surgeons, and by mid-2023 RxSight had saturated its core LASIK and high-volume surgeon market; (ii) the RxSight System imposed significant burdens on practices, requiring up to five additional clinical hours per LAL patient to complete adjustments and lock-ins, which reduced practice profitability and depressed adoption and use, as the surgeons surveyed by Wells Fargo had reported; and (iii) RxSight lacked adequate field support to drive adoption and utilization. Cohorts were not all growing, and newer cohorts were not adopting faster; instead, older cohorts' utilization was flat and each newer cohort was adopting more slowly than the one before.

***November 2024***

118. After the market closed on November 7, 2024, RxSight reported third quarter 2024 results that disclosed a sequential decline in utilization, essentially flat sequential LDD placements, and a sequential LAL revenue increase of only 1.4%. RxSight's stock price declined nearly 7% the next day. The Individual Defendants

attributed the results to seasonality and surgeon vacations. On the earnings call that day, Defendant Kurtz stated:

> "[T]he LAL+ delivers an average of 1.3 additional lines of distance corrected near vision compared to the already excellent vision achieved with the standard LAL. This combined with the ability to customize refraction in both eyes, a path taken by over 90% of LAL patients, leads to remarkable binocular visual outcomes, with more than 90% of patients achieving distance vision of 20, 20 or better and near vision of J2 or better without glasses."
>
> "[U]tilization has grown over time and it continues to grow. So, I think that overall, the . . . numbers are going in the right direction. . . . But generally[,] we see those numbers going up."

119. On the same call, when asked whether utilization trends had changed in the past few quarters, Defendant Thunen stated:

> "[W]hat we've seen is that the classes by year of install, '21 and before, '22 and then '23 which you're now probably 'installed enough' is that they all end up at the same place in terms of volume. . . . And as I've said, what we do see is the newer accounts, right[?] [T]hose adopted in '23 and now the beginning of '24, tend to get to the same place, not the same apex [a]s the rest of the accounts, but get to the same place a bit quicker as well."
>
> "[W]hen I look internally at our data by cohort by [year of] install, the more recent installs get to the same place a little bit more quicker, right?"

120. In the press release announcing its third quarter 2024 results (the "3Q24 Earnings Release"), RxSight stated:

> Key Quarterly Highlights
>
> - Reported third quarter 2024 revenue of $35.3 million, an increase of 59% compared to the third quarter of 2023, reflecting:

- o The sale of 24,554 Light Adjustable Lenses (LAL™/LAL+™), representing an 80% increase in procedure volume compared to the third quarter of 2023; and
- o The sale of 78 Light Delivery Devices (LDD™s), representing a 18% increase in unit sales compared to the third quarter of 2023 and expanding the installed base to 888 LDDs at the end of the quarter, representing a 51% increase compared to the end of the third quarter of 2023.

- The company raised its 2024 full-year revenue guidance to the top of its previous guidance range, increased its gross margin guidance and lowered its operating expense guidance. . . .

Third Quarter Financial Results

In the third quarter of 2024, total revenue was $35.3 million, an increase of 59% compared to $22.2 million in the third quarter of 2023. Revenue growth was driven by a 79% increase in LAL revenue and a 28% increase in LDD revenue, compared to the third quarter of 2023.

Gross profit for the third quarter of 2024 was $25.2 million or 71.4% of revenue, an increase of $11.5 million or 84% compared to gross profit of $13.7 million or 61.9% of revenue for the third quarter of 2023. The year over year increase in gross profit was driven by continued growth in the percentage of LAL sales as a proportion of total sales, lower cost of sales for both the LDD and LAL, and sustained pricing stability for company's capital equipment.

121. The 3Q24 Earnings Release also quoted Defendant Kurtz as stating:

We are pleased to report another strong quarter driven by ongoing demand and enthusiasm for the RxSight system[.] With 78 LDDs sold this quarter and sustained growth in

> LAL sales, we continue to see recognition of the transformative power of adjustability and the significant value it provides to both patients and doctors. We believe our third-quarter results position us for a strong finish to 2024 and for continued success in the years to come.

122. On the November 7, 2024 earnings call, Defendant Thunen further stated:

> RxSight generated third quarter 2024 revenue of $35.3 million, up 59% compared to $22.2 million in the year ago quarter and up 1% compared to $34.9 million in the second quarter of 2024.
>
> During the quarter, we sold 24,554 LALs and generated $24.2 million in LAL revenue, up 79% and 2% compared to the same year ago quarter and the second quarter of this year, respectively. This sequential performance reflects typical seasonality in cataract surgery volumes, which tend to dip in the third quarter as both doctors and patients often travel during the summer months.
>
> Additionally, in the third quarter, LAL revenue represented 69% of total revenue, an increase from 61% in the year ago period and from 68% in the second quarter of 2024. We sold 78 LDDs in the third quarter, up 18% to the 66 units in the year ago period and matching the 78 units sold in the second quarter that is typically stronger for capital equipment.
>
> During the period, LDD sales generated revenue of $10.1 million, up 28% versus the third quarter of 2023 and essentially the same as the second quarter of 2024. As of September 30, 2024, our LDD installed base stood at 888 units, representing an increase of 51% and 10% versus the year ago period and the second quarter of 2024, respectively. Reflecting continued demand, our average selling price for the LDD remained stable at approximately $130,000.

> During the quarter, average monthly utilization, defined as the number of LALs implanted in the quarter divided by the LDD installed base in the previous quarter was 10.1 LALs per LDD, up from 8.7 LALs per LDD in the same period last year. While LAL growth remained strong in the third quarter, average monthly utilization was lower than the 11 LALs per LDD seen in the second quarter, a period that was and is generally a seasonally strong quarter.
>
> The gross margin in the third quarter of 2024 was 71.4% compared to 61.9% in the same year ago quarter and 69.5% in the second quarter of 2024. The year-over-year increase reflects the continued increase in the percentage of LALs as a percentage of sales, lower cost of sales for both the LDD and LAL, and sustained pricing stability.

123. Also on November 7, 2024, RxSight filed its quarterly report on Form 10-Q for the third quarter of 2024, signed and certified by Defendants Kurtz and Thunen, which, like the Company's other Relevant Period periodic reports, attributed increased LDD and LAL sales to strong adoption of the RxSight System by practices and doctors. The 3Q24 10-Q stated:

> Key business metrics
>
> We regularly review several operating and financial metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate our business plan and make strategic decisions. We believe the number of LDDs installed and LALs implanted are indicators of our ability to drive adoption and generate revenue.
>
> We believe the number of LDDs sold in each quarter and our LDD installed base at the end of each period are important metrics as they represent an installed base into which we can sell our LALs. We also believe the number of LALs sold (reported as implanted in a patient) in each

> quarter is an important metric indicative of adoption and utilization of our RxSight system. . . .
>
> During the quarter ended September 30, 2024, we had increased LDD sales of 12 and increased LAL sales of 10,897 when compared to the quarter ended September 30, 2023 from strong adoption of our RxSight technology by practices and doctors combined with an increased LDD installed base.
>
> Our quarterly and annual financial results may fluctuate as a result of a variety of factors many of which are outside our control. We may not yet be able to accurately assess seasonality and other trends, and we will continue to evaluate our business in the future using these and other financial metrics as we observe trends in our business. . . .
>
> Sales increased by $13.1 million, or 59.1%, to $35.4 million for the three months ended September 30, 2024, from $22.2 million for the three months ended September 30, 2023. The increase in total sales was primarily due to the incremental sales of 10,897 LALs and 12 LDDs from strong adoption of our RxSight system by practices and doctors.

124. The 3Q24 10-Q also purported to warn of risks that had already materialized, stating:

> The commercial success of our RxSight system will depend upon attaining significant market acceptance of these products among patients and doctors.
>
> Our success will depend, in part, on the acceptance of our RxSight system as safe, effective and, with respect to doctors, cost-effective.
>
> . . .

> Our results of operations could be materially harmed if we are unable to accurately forecast customer demand for our products and manage our inventory.
>
> We seek to maintain sufficient levels of inventory in order to protect ourselves from supply interruptions, but due to the expansion of global lead times, particularly in Europe and Asia, has resulted in the lack of availability of raw materials, including semiconductors, computers, monitors electronic parts, metals, packaging, adhesives, chemicals, resins and subcontract painted components, limiting our ability to maintain as much inventory of components, sub-assemblies, materials and finished products on hand as would be ideal under normal circumstances. To ensure adequate inventory supply and manage our operations with our third-party manufacturers and suppliers, we forecast anticipated materials requirements and demand for our products in order to predict inventory needs and then place orders with our suppliers based on these predictions. . . .

125. These statements were materially false and misleading because the Individual Defendants knew or recklessly disregarded that: (i) the clinical outcomes Defendants touted were drawn from controlled studies and selected data that did not reflect ordinary clinical practice, where most LAL patients still required reading glasses for near vision; (ii) the LAL+ produced glare and halos similar to other premium lenses and drew heavily negative physician commentary; (iii) RxSight lacked adequate field support to drive adoption and utilization; and (iv) adoption was not “strong” but slowing, as newer customers were adopting more slowly than earlier customers and older customers’ utilization was flat. The disappointing results were not attributable to seasonality, and newer installs were not reaching mature utilization levels more quickly. In addition, the 3Q24 Earnings Release, Defendant Thunen’s November 7, 2024 statements, and the 3Q24 10-Q touted LAL and LDD sales growth, “continued demand,” and “strong adoption” while concealing these

adverse adoption and utilization trends, and the 3Q24 10-Q's risk disclosures presented as merely hypothetical risks concerning market acceptance and customer demand that had already materialized.

***January and February 2025***

126. After the market closed on January 12, 2025, RxSight issued preliminary fourth quarter and full-year 2024 results disclosing that LDD sales growth had decelerated to 8% year over year, compared to 18% in the prior quarter. RxSight's stock price declined more than 8% the next trading day. The Individual Defendants attributed the deceleration to doctors using third-party treatment centers. On January 15, 2025, at the JPMorgan Healthcare Conference, Defendant Kurtz stated:

> "We believe the Light Adjustable Lens enables a better approach, namely post-operative customization of the LAL for optimized vision without glasses."
>
> "Just as important as better clinical results is the ability of the LAL to enable a better business solution by boosting practice profitability through enhanced premium IOL adoption. . . . The combination of patients converting from each of these other lenses to the LAL with the LAL's higher revenue leads to approximately $2,000 in additional revenue per LAL implanted for the practice. This means that average practices can pay for the cost of the Light Delivery Device in about six months, after which the additional revenue accrues to their bottom line."

127. The January 12, 2025 press release (the "Preliminary 4Q24 Earnings Release") stated:

> Preliminary Unaudited Fourth Quarter and Full-year 2024 Results
>
> - Preliminary unaudited fourth quarter 2024 revenue is expected to be approximately $40.2 million,

representing growth of approximately 41% compared to the prior year period, driven by:

- The sale of 29,069 Light Adjustable Lenses (LAL™/LAL+®); representing a 61% increase in procedure volume compared to the fourth quarter of 2023; and

- The sale of 83 Light Delivery Devices (LDD™s), expanding the installed base to 971 LDDs as of December 31, 2024, representing a 46% increase compared to the installed base at end of the fourth quarter of 2023.

- Preliminary unaudited 2024 fiscal year revenue is expected to be approximately $139.9 million, representing growth of approximately 57% compared to the prior year, driven by:

  - The sale of 98,055 LALs; representing a 79% increase in procedure volume compared to 2023; and

  - The sale of 305 LDDs.

- Preliminary unaudited cash, cash equivalents and short-term investments as of December 31, 2024, is expected to be $237.2 million.

128. The Preliminary 4Q24 Earnings Release also quoted Defendant Kurtz as stating:

> During the fourth quarter, we achieved record highs for LDD sales and LAL procedures, meaningfully exceeding our initial full-year 2024 revenue guidance. With nearly one thousand LDDs installed, we now serve an estimated 15% of cataract surgeons in North America, while LAL procedures account for over 10% of the region's premium IOL market. We believe this sustained growth in one of ophthalmology's most competitive segments reflects the

> growing recognition of the superior visual outcomes enabled by adjustability. . . . In 2025, we expect adoption for the RxSight system to remain strong as we collaborate with a diverse range of customers to further expand the infrastructure for post-operative light treatments. Building on our momentum in North America, we also look forward to entering key international markets in Asia and Europe. Finally, leveraging the foundation established since our initial FDA approval, we plan to continue to innovate the RxSight system, that we believe will continue to set the standard for the premium IOL market for years to come.

129. The Preliminary 4Q24 Earnings Release also provided the Company's 2025 guidance:

> 2025 Guidance
>
> RxSight anticipates full-year 2025 revenue in the range of $185.0 million to $197.0 million, reflecting growth of approximately 32% to 41% over 2024. The company currently estimates the full-year 2025 gross profit margin to be in the 71% to 73% range. In addition, the company expects full-year 2025 operating expenses in the range of $165.0 million to $170.0 million, including non-cash stock-based compensation expense guidance in the range of $22.0 million to $25.0 million.

130. On February 25, 2025, on the Company's fourth quarter 2024 earnings call, Defendant Thunen stated:

> What we've always seen is that [cohorts are] continu[ing] to grow, right?
>
> And so, all of the cohorts end up in just about the same place of number of LALs per LDD. And that's been very consistent as we've been looking at this for the last couple of years. Of course, the class of '23 got to those same numbers a little faster[,] obviously[,] than in the classes of '21 and '22.

131. Also on February 25, 2025, RxSight issued a press release announcing its fourth quarter and full-year 2024 results (the "4Q24 Earnings Release"), which stated:

> Key Quarterly and Full-Year Highlights
>
> - Recognized fourth quarter 2024 revenue of $40.2 million, an increase of 41% compared to the fourth quarter of 2023, reflecting:
>   - The sale of 29,069 Light Adjustable Lenses (LAL™/LAL+®), representing an 61% increase in procedure volume compared to the fourth quarter of 2023; and
>   - The sale of 83 Light Delivery Devices (LDD™s), expanding the installed base to 971 LDDs at the end of the quarter, a 46% increase compared to the 666-unit LDD installed base at the end of the fourth quarter of 2023.
> - Recognized full-year 2024 revenue of $139.9 million, a 57% increase over 2023, driven by unit sales of 98,055 LALs and 305 LDDs, representing growth of 79% and 15% respectively, compared to 2023. . . .
>
> Fourth Quarter Financial Results
>
> In the fourth quarter of 2024, total revenue was $40.2 million, an increase of 41% compared to $28.6 million in the fourth quarter of 2023. Revenue growth was driven by a 60% increase in LAL revenue and a 7% increase in LDD revenue, compared to the fourth quarter of 2023.
>
> Gross profit for the fourth quarter of 2024 was $28.8 million or 71.6% of revenue, an increase of $11.1 million compared to gross profit of $17.7 million or 61.8% of revenue for the fourth quarter of 2023. The year over year increase in gross profit was driven by continued growth in the percentage of LAL sales as a proportion of total sales, lower cost of sales for both the LDD and LAL, and

> sustained pricing stability for company's capital equipment. . . .
>
> Fiscal Year 2024 Financial Results
>
> Full-year 2024 total revenue was $139.9 million, an increase of 57% compared to the full year of 2023. The increase in 2024 revenue was driven by a 78% increase in LAL revenue and 24% increase in LDD revenue compared to 2023.
>
> Gross profit for the full year of 2024 was $98.9 million, or 70.7% of revenue compared to gross profit of $53.8 million, or 60.4% of revenue for the full year of 2023. The increase in gross profit was due to a favorable product mix from a greater percentage of revenue from LAL sales and increased margins on the LDD introduced during the third quarter of 2023.

132. The 4Q24 Earnings Release also reiterated the Company's 2025 guidance:

> 2025 Guidance
>
> The company is reiterating guidance for the full-year 2025 revenue, gross profit margin, and operating expenses:
>
> - Revenue in the range of $185.0 million to $197.0 million, representing implied growth of approximately 32% to 41% compared to 2024;
> - Gross margin in the range of 71% to 73%, representing an implied increase of 30 bps to 230 bps compared to 2024;
> - Operating expenses in the range of $165.0 to $170.0 million, representing an implied increase of 22% to 25% compared to 2024;
> - Operating expense guidance also includes non-cash expenses in the range of $22.0 million to $25.0 million.

133. On the February 25, 2025 earnings call, Defendant Thunen also stated:

> Consistent with our January preannouncement RxSight reported fourth quarter 2024 revenue of $40.2 million, up 41% compared to the year ago quarter. Growth was broad based, driven by strong growth in LAL procedure volume and the continued expansion of our installed base of LDDs.
>
> The positive momentum we saw throughout 2024 remains fueled by surgeons increasing appreciation of the clinical advantage and economic value of the RxSight system, particularly the benefits of post operative adjustability. LAL sales maintained strong growth in the fourth quarter of 2024, reflecting the increased preference amongst surgeons and patients for the enhanced clinical outcomes offered by our adjustable IOLs.
>
> We sold a record of 29,069 LALs in the period, up 61% from the fourth quarter of 2023. These procedure volumes translated into LAL revenue of $28.5 million in the fourth quarter of 2024, up 60% compared to the year ago quarter.
>
> In the fourth quarter of 2024, we sold 83 LDDs and generated $10.7 million in LDD revenue. We ended 2024 with an LDD installed base of 971 units, up 46% compared to the 666 units installed at the end of 2023. Higher LAL volume in the fourth quarter also led to an increased LAL revenue mix, with LAL revenue accounting for 71% of total revenue, up from 62% in the fourth quarter of 2023. This shift in mix, combined with LDD sales with a lower manufacturing cost and higher average selling price expanded our gross margin to 71.6% in the fourth quarter of 2024, up from 61.8% in the fourth quarter of 2023.

134. Also on February 25, 2025, RxSight filed its Annual Report on Form 10-K for fiscal year 2024 (the "2024 10-K"), which was signed by Defendants Kurtz, Thunen, Corley, Link, Tammenoms Bakker, Andrews, Palmisano, Warner, Maniar, and Fountain. The 2024 10-K stated:

During 2024, we had increased LDD sales of 39 and increased LAL sales of 43,182 when compared to 2023 from strong adoption of our RxSight technology by practices and doctors combined with an increased LDD installed base.

Sales increased by $50.8 million, or 57.1%, to $139.9 million for the year ended December 31, 2024 from $89.1 million for the year ended December 31, 2023. The increase was due to incremental sales of 43,182 LALs primarily due to continued penetration in existing customers, an increased LDD installed base of 305 and incremental sales of 39 LDDs from strong adoption of our RxSight technology by practices and doctors.

135. The 2024 10-K further stated:

Key business metrics

We regularly review several operating and financial metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate our business plan and make strategic decisions. We believe the number of LDDs installed and, LALs implanted are indicators of our ability to drive adoption and generate revenue. We believe these are important metrics for our business. We may not yet be able to accurately assess seasonality and other trends, and we will continue to evaluate our business in the future using these and other financial metrics as we observe trends in our business. Our quarterly and annual financial results may fluctuate as a result of a variety of factors many of which are outside our control. For example, it is not uncommon in our industry to experience seasonally weaker sales during the summer months and end-of-year holiday season. We may be affected by other seasonal trends in the future, including severe weather (which can impact the number of elective procedures performed), particularly as our business matures. Additionally, this seasonality may be reflected to a much lesser extent, and sometimes may not be immediately apparent, in our revenue. To the extent we experience this seasonality, it may cause fluctuations in our operating results and financial metrics and make

> forecasting our future operating results and financial metrics more difficult.
>
> We believe the number of LDDs sold in each quarter and our LDD installed base at the end of each period are important metrics as they represent an installed base into which we can sell our LALs. We also believe the number of LALs sold (reported as implanted in a patient) in each quarter is an important metric indicative of adoption and utilization of our RxSight system.

136. The 2024 10-K also purported to warn of risks that had already materialized, stating:

> The commercial success of our RxSight system will depend upon attaining significant market acceptance of these products among patients and doctors. . . .
>
> For example, some doctors may choose to utilize our RxSight system on only a subset of their total patient population or may not adopt our RxSight system at all. If we are not able to effectively demonstrate that the use of our RxSight system is beneficial in a broad range of patients, adoption of our product will be limited and may not occur as rapidly as we anticipate or at all, which would have a material adverse effect on our business, financial condition and results of operations. We cannot assure you that our products will achieve broad market acceptance among doctors. Additionally, even if our products achieve market acceptance, they may not maintain that market acceptance over time if competing products, procedures or technologies are considered safer or more cost-effective or otherwise superior. Any failure of our products to generate sufficient demand or to achieve meaningful market acceptance and penetration will harm our future prospects and have a material adverse effect on our business, financial condition and results of operations. . . .

> Our results of operations could be materially harmed if we are unable to accurately forecast customer demand for our products and manage our inventory.
>
> We seek to maintain sufficient levels of inventory in order to protect ourselves from supply interruptions, but due to the expansion of global lead times, particularly in Europe and Asia, has resulted in the lack of availability of raw materials, including semiconductors, computers, monitors electronic parts, metals, packaging, adhesives, chemicals, resins and subcontract painted components, limiting our ability to maintain as much inventory of components, sub-assemblies, materials and finished products on hand as would be ideal under normal circumstances. To ensure adequate inventory supply and manage our operations with our third-party manufacturers and suppliers, we forecast anticipated materials requirements and demand for our products in order to predict inventory needs and then place orders with our suppliers based on these predictions.

137. These statements were materially false and misleading because the Individual Defendants knew or recklessly disregarded that: (i) most LAL patients in ordinary clinical practice still required reading glasses for near vision; (ii) far from boosting practice profitability, the RxSight System required up to five additional clinical hours per LAL patient to complete adjustments and lock-ins, which reduced practice profitability and made LALs less economical than competing premium procedures; (iii) LALs were not more effective for near vision than standard IOLs that were free to patients or covered by Medicare or insurance, which made LALs uncompetitive given their substantially higher cost; and (iv) the cohorts were not continuing to grow, as older customers' utilization was flat and newer customers were adopting more slowly than earlier customers. In addition, by attributing sales growth to "strong adoption" while omitting the known trend of slowing new-cohort adoption and flat older-cohort utilization, the 2024 10-K, as well as the Company's

Forms 10-Q filed on May 6, 2024, August 5, 2024, November 7, 2024, and May 7, 2025, failed to disclose known trends and uncertainties that were reasonably likely to have a material unfavorable impact on net sales or revenues, as required by Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303.

138. Further, the Preliminary 4Q24 Earnings Release, the 4Q24 Earnings Release, and Defendant Thunen's February 25, 2025 statements touted "sustained growth," "positive momentum," and the expectation that adoption would "remain strong" in 2025, and issued and reiterated 2025 revenue guidance of $185.0 million to $197.0 million, while concealing that the Company had overstated the demand for its products and was unlikely to meet that guidance; and the 2024 10-K's risk disclosures presented as merely hypothetical risks concerning market acceptance and customer demand that had already materialized.

***The April 2025 Partial Disclosure and Statements***

139. After the market closed on April 2, 2025, RxSight issued preliminary first quarter 2025 results reporting revenue down 6% sequentially and reduced its full-year 2025 revenue guidance from $185.0 million–$197.0 million to $160.0 million–$175.0 million. On an investor call before the market opened on April 3, 2025, Defendants disclosed that LDD sales had declined 12% sequentially, LAL sales had declined 5% sequentially, and utilization had declined year over year for the first time since 2021. RxSight's stock price declined from $26.12 per share on April 2, 2025 to $16.21 per share on April 3, 2025, a decline of nearly 38%.

140. The Individual Defendants again concealed the true causes, blaming the broader premium IOL market and the macroeconomic environment. On the April 3, 2025 call, Defendant Kurtz stated:

> "[T]he top line miss in Q1 was due to several factors, including a weakened premium IOL market and unusual sequential launches of new premium IOLs that have extended from mid-2024 and into Q1 of 2025. These

> factors subsequently combined with abrupt changes in consumer sentiment that occurred later in Q1, resulting in our first year-over-year drop in same-store LAL sales, most commonly measured as LALs per LDD per month."
>
> "I would say that as you described, there's been a confluence of factors that happened in Q1, particularly in the latter part of Q1. And I think that all of them are transitory to some extent . . . . I think the obvious thing that changed in Q1 was the macro environment."
>
> "I don't think that we've fully penetrated any group. There are a wide variety of practices that have not yet adopted our technology. We have about 1,000 LDDs. There are about 2,000 surgeons. There are 10,000 cataract surgeons out there with at least several to more thousands of practice product offices where cataract surgery is cataract surgery patients are seen. So I certainly don't believe that we're anywhere near a saturation point and even by a class of surgeon."

141. The April 2, 2025 press release (the "Preliminary 1Q25 Earnings Release") stated:

> Preliminary First Quarter 2025 Results
>
> - Preliminary first quarter 2025 revenue is expected to be approximately $37.9 million, representing growth of 28% compared to the prior year period, and a decrease of 6% compared to the fourth quarter of 2024, driven by:
>     - The sale of 27,579 Light Adjustable Lenses (LAL™/LAL+®); representing a 36% increase in procedure volume compared to the first quarter of 2024; and
>     - The sale of 73 Light Delivery Devices (LDD™s), bringing the installed base to 1,044 LDDs as of March 31, 2025, which represents a 43% expansion compared to the installed base of 732 LDDs at end of the first quarter of 2024.

142. The Preliminary 1Q25 Earnings Release also provided revised 2025 guidance:

> Revised 2025 Guidance
>
> The company decreased its 2025 full-year revenue and operating expense guidance as follows:
>
> Revenue in the range of $160.0 million to $175.0 million, a decrease from the previous guidance range of $185.0 million to $197.0 million, representing implied growth of 14% to 25% compared to 2024;
>
> Operating expenses in the range of $150.0 to $160.0 million, a decrease from the previous guidance range of $165.0 million to $170.0 million and now representing an implied increase of 10% to 18% compared to 2024. . . .

143. These statements were materially false and misleading, and omitted material facts necessary to make them not misleading, because the Individual Defendants knew or recklessly disregarded that the first quarter 2025 decline was not the product of transitory market-wide or macroeconomic factors, but of the undisclosed adoption and utilization problems described herein: (i) newer customers were adopting more slowly than earlier customers and older customers' utilization was flat; (ii) RxSight lacked adequate field support to drive adoption and utilization; and (iii) LALs were a niche product that worked best for former LASIK patients or when implanted by LASIK surgeons, and by mid-2023 RxSight had saturated its core LASIK and high-volume surgeon market, contrary to Defendant Kurtz's assertion that RxSight was not "anywhere near a saturation point." In addition, the Preliminary 1Q25 Earnings Release's revised guidance of $160.0 million to $175.0 million lacked a reasonable basis, as the Company was unlikely to meet even that reduced guidance.

***The April 2025 Proxy Statement***

144. On April 21, 2025, RxSight filed the 2025 Proxy (together with the 2024 Proxy, the "Proxies"), which solicited shareholder votes to, among other things, re-elect Defendants Kurtz, Corley, and Tammenoms Bakker to the Board and to approve, on an advisory basis, the compensation of the Company's named executive officers. At the June 3, 2025 annual meeting, shareholders re-elected Defendants Kurtz, Corley, and Tammenoms Bakker. The 2025 Proxy touted the Company's 2024 performance as follows:

> 2024 Business Highlights
>
> - The sale of 98,055 LALs in 2024, representing a 79% increase in procedure volume as compared to 2023.
> - The sale of 305 LDDs in 2024, representing a 15% increase in unit sales compared to 2023 and expanding the installed base to 971 LDDs at the end of 2024, representing a 46% increase compared to the end of 2023.
> - Sales for 2024 were $139.9 million, an increase of $50.9 million or 57%, compared to 2023.
> - Gross profit for 2024 was $98.9 million, an increase of $45.2 million or 84%, compared to 2023.
> - Gross margin for 2024 increased to 70.7% compared to 60.4% in 2023, primarily due to the increased proportion of LAL sales to total sales, lower LDD material costs, and an increase in average LDD selling price.
> - Total operating expenses were $135.8 million for 2024, compared to $103.9 million in 2023.
> - Loss from operations was $36.9 million for 2024, compared to $50.1 million in 2023.
> - Cash, cash equivalents, and short-term investments were $237.2 million as of December 31, 2024.
> - In May 2024, we received $107.5 million in net proceeds from a confidentially marketed public offering.

145. The 2025 Proxy also assured shareholders, under the heading "Role of the Board in risk oversight," that "[o]ur Board has an active role, as a whole and also at the committee level, in overseeing the management of our risks" and that "our entire Board is regularly informed through discussions from committee members about such risks."

146. The 2025 Proxy was materially false and misleading because it touted the Company's sales growth and the Board's active risk oversight while failing to disclose that RxSight was experiencing undisclosed adoption challenges, that newer cohorts were adopting more slowly and older cohorts' utilization was flat, that the Company was unlikely to meet even its reduced 2025 guidance, and that the Board was not effectively overseeing the Company's operational and disclosure risks.

***May 2025***

147. On May 7, 2025, on the Company's first quarter 2025 earnings call, Defendant Kurtz stated:

> "As we discussed during our pre-announcement just over a month ago, the first quarter brought an unusual combination of macroeconomic headwinds and competitive disruptions that led to our first top line miss since becoming a public company in Q3 2021."
>
> "LALs were also affected by temporary negative wealth effects and uncertainty."
>
> "While macro trends worsened in early April, there were signs of improved stabilization later in the month, which were also observed in our procedure volumes."
>
> "[B]oth binocular distance and near visual acuity without glasses was found to be statistically better with an adjustable lens with more than twice the number of patients attaining 20/20 distance and J1 reading vision than with the fixed multifocal IOL."

148. When asked on the same call whether the LAL was nearing a saturation point in the United States, Defendant Kurtz responded: "I don't see a good argument

for that based on the overall penetration of the technology. We're currently sitting at maybe somewhere between 10% and 12% where there are many, many surgeons, I would say, even most who are just getting familiar with the LAL and the potential."

149. Also on May 7, 2025, RxSight issued a press release announcing its first quarter 2025 results (the "1Q25 Earnings Release"), which stated:

> Key Quarterly Highlights
>
> - Reported first quarter 2025 revenue of $37.9 million, an increase of 28% compared to the first quarter of 2024, reflecting:
>     - The sale of 27,579 Light Adjustable Lenses (LAL®/LAL+®), representing a 36% increase in procedure volume compared to the first quarter of 2024;
>     - The sale of 73 Light Delivery Devices (LDD™s), bringing the installed base to 1,044 LDDs as of March 31, 2025, which represents a 43% expansion compared to the installed base of 732 LDDs at end of the first quarter of 2024; and
> - The company reiterated its 2025 full-year revenue, gross margin and operating expense guidance.
>
> First Quarter Financial Results
>
> In the first quarter of 2025, total revenue was $37.9 million, an increase of 28% compared to $29.5 million in the first quarter of 2024. Revenue growth was driven by a 37% increase in LAL revenue and an 8% increase in LDD revenue, compared to the first quarter of 2024.
>
> Gross profit for the first quarter of 2025 was $28.3 million or 74.8% of revenue, an increase of $7.6 million compared to gross profit of $20.7 million or 70.1% of revenue for the first quarter of 2024. The lower cost of sales for both the LDD and LAL drove the increase in gross profit in the

> quarter, along with the favorable shift in product mix toward LAL sales, and sustained pricing stability for company's capital equipment.

150. The 1Q25 Earnings Release also quoted Defendant Kurtz as stating:

> The exceptional clinical value delivered by our Light Adjustable Lens continues to drive significant enthusiasm among cataract surgeons. . . . The excitement and engagement we observed at the recent ASCRS meeting further reinforces our conviction that customization and post-operative adjustability are shaping the future of premium cataract surgery. Supported by strong customer and patient interest, an innovative product pipeline, the expansion of third-party light treatment service center business models, and recent international regulatory approvals, we believe we are well-positioned to lead the next chapter of growth in the premium IOL market.

151. The 1Q25 Earnings Release also reiterated the Company's 2025 guidance:

> 2025 Guidance
>
> The company reiterated its 2025 full-year revenue, gross margin and operating expense guidance as follows:
>
> - Revenue of $160.0 million to $175.0 million, representing implied growth of 14% to 25% compared to 2024;
>
> - Gross margin in the range of 71% to 73%, representing an implied increase of 30 basis points to 230 basis points compared to 2024. . . .

152. On the May 7, 2025 earnings call, Defendant Thunen stated:

> During the quarter, we sold 27,579 LALs and generated $27.2 million in LAL revenue, up 37% compared to the first quarter of 2024 and down 5% compared to the fourth quarter of 2024.

> In the first quarter of this year, LAL revenue represented 72% of total revenue, an increase from 67% and 71% in the first and fourth quarters of 2024, respectively. During the first quarter of 2025, we sold 73 LDDs, up 11% compared to the 66 units in the year ago quarter.
>
> On a sequential basis, our LDD units sold during the first quarter were down 12% compared to the seasonally strong capital equipment fourth quarter with the sale of 83 LDDs.
>
> During the quarter, LDD sales generated revenue of $9.4 million, up 8% compared to the first quarter of 2024 and down 12% versus the strong fourth quarter of 2024. As of March 31st, 2025, our LDD installed base stood at 1,044 units, up 43% and 8% versus the first and fourth quarters of 2024, respectively.
>
> Gross margin in the first quarter of 2025 was 74.8% compared to 70.1% and 71.6% in the first and fourth quarters of 2024, respectively. The increased gross margin was primarily due to lower LAL costs and mix. Because we consign LAL inventory, we recognize the LAL cost of goods sold about nine months after we build product.

153. Also on May 7, 2025, RxSight filed its quarterly report on Form 10-Q for the first quarter of 2025, signed and certified by Defendants Kurtz and Thunen, which again attributed increased LDD and LAL sales to strong adoption of the RxSight technology by practices and doctors. The 1Q25 10-Q stated:

> Key business metrics
>
> We regularly review several operating and financial metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate our business plan and make strategic decisions. We believe the number of LDDs installed and LALs implanted are indicators of our ability to drive adoption and generate revenue.

> We believe the number of LDDs sold in each quarter and our LDD installed base at the end of each period are important metrics as they represent an installed base into which we can sell our LALs. We also believe the number of LALs sold (reported as implanted in a patient) in each quarter is an important metric indicative of adoption and utilization of our RxSight system. . . .
>
> During the quarter ended March 31, 2025, we had increased LDD sales of 7 and increased LAL sales of 7,361 when compared to the quarter ended March 31, 2024 from strong adoption of our RxSight technology by practices and doctors combined with an increased LDD installed base.

154. The 1Q25 10-Q also purported to warn of risks that had already materialized, stating:

> The commercial success of our RxSight system will depend upon attaining significant market acceptance of these products among patients and doctors.
>
> Our success will depend, in part, on the acceptance of our RxSight system as safe, effective and, with respect to doctors, cost-effective. We cannot predict how quickly, if at all, patients, doctors, or payors will accept our RxSight system or, if accepted, how frequently it will be used. Our RxSight system and planned or future products we may develop or market may never gain broad market acceptance for some or all of our targeted indications. Patients and doctors must believe that our products offer benefits over alternative treatment methods. To date, a substantial majority of our product sales and revenue have been derived from current customers that have adopted our RxSight system.
>
> . . .

> Our results of operations could be materially harmed if we are unable to accurately forecast customer demand for our products and manage our inventory.
>
> We seek to maintain sufficient levels of inventory in order to protect ourselves from supply interruptions, but due to the expansion of global lead times, particularly in Europe and Asia, has resulted in the lack of availability of raw materials, including semiconductors, computers, monitors electronic parts, metals, packaging, adhesives, chemicals, resins and subcontract painted components, limiting our ability to maintain as much inventory of components, sub-assemblies, materials and finished products on hand as would be ideal under normal circumstances. To ensure adequate inventory supply and manage our operations with our third-party manufacturers and suppliers, we forecast anticipated materials requirements and demand for our products in order to predict inventory needs and then place orders with our suppliers based on these predictions. . . .

155. These statements were materially false and misleading because the Individual Defendants knew or recklessly disregarded that: (i) newer customers were adopting more slowly than earlier customers and older customers' utilization was flat; (ii) RxSight lacked adequate field support to drive adoption and utilization; (iii) by mid-2023 RxSight had saturated its core LASIK and high-volume surgeon market, contrary to Defendant Kurtz's denial that the LAL was nearing a saturation point; and (iv) the clinical outcomes Defendants touted were drawn from controlled studies and selected data that did not reflect ordinary clinical practice. The decline was neither temporary nor attributable to macroeconomic conditions; it was structural and driven by the undisclosed adoption and utilization problems described herein. Further, the 1Q25 Earnings Release and Defendant Thunen's May 7, 2025 statements touted LAL and LDD sales growth and "significant enthusiasm among cataract surgeons" and reiterated 2025 revenue guidance of $160.0 million to $175.0

million, while concealing that the Company had overstated the demand for its products and was unlikely to meet that guidance; and the 1Q25 10-Q's risk disclosures presented as merely hypothetical risks concerning market acceptance and customer demand that had already materialized.

## **THE TRUTH IS REVEALED**

156. On July 8, 2025, after the market closed, RxSight issued a press release announcing preliminary second quarter 2025 results. RxSight disclosed that it sold only 40 LDDs in the quarter, a 45% decrease from the first quarter of 2025 and a 49% decrease from the second quarter of 2024; that LAL sales had declined sequentially to 27,380 units; and that second quarter revenue was expected to be approximately $33.6 million, down 4% year over year and 11% sequentially. RxSight again cut its full-year 2025 revenue guidance, to a range of $120.0 million to $130.0 million from the prior range of $160.0 million to $175.0 million, implying a year-over-year revenue decline.

157. The press release quoted Defendant Kurtz as stating:

> Guided by insights from our second quarter underperformance and building on our long-term vision, we are evolving our commercial approach to re-direct more of our focus toward supporting customer success within new and existing practices[.] By deepening our engagement with our clinical partners, we believe we will be better positioned to ensure they can fully realize the benefits of adjustability and achieve the superior outcomes for their patients that ultimately drive further LAL adoption.

158. On the conference call held the same day, Defendants Kurtz and Thunen revealed that newer cohorts, and in particular the 2024 cohort, were adopting more slowly; that the Company's earliest cohort's utilization had been flat going back four quarters; and that each newer cohort was down more than the one before it. Defendant Kurtz explained that the Company was executing a commercial pivot,

including an overhaul of its field support, to close adoption gaps. In response to an analyst's question, Defendant Kurtz stated:

> Well, I would say that we generally believe that LDD sales are driven by the previous generation of successful LAL adopters. So it is critical for us going forward to reverse those utilization trends so that we can point to customers who continue to have success and excellent ROI with the LAL. And so I do think that the two are linked and that the adoption challenges that we've had over the last few quarters have been a primary underlying reason for the LDD stall. There are, as I mentioned, some potential quarterly specific things related to longer capital equipment acquisition times, and we tend to be very back-end loaded. But again, if we focus on the areas that we can accelerate and impact LDD in the long run, we believe that is by accelerating LAL utilization.

159. Defendant Kurtz's admission that the adoption problems disclosed in July 2025 had existed over the preceding several quarters, the very period in which the Individual Defendants were assuring investors that all cohorts were growing and that newer cohorts were adopting faster, confirms that the Individual Defendants' earlier statements were false and misleading when made.

160. On this news, RxSight's stock price fell $4.84 per share, from a close of $12.79 per share on July 8, 2025 to a close of $7.95 per share on July 9, 2025, a decline of nearly 38%, on above-average trading volume. By the end of the Relevant Period, RxSight had lost approximately $1.87 billion in market capitalization since the May 2024 offering.

***Post-Disclosure Developments***

161. RxSight's performance continued to deteriorate after the Relevant Period. On November 5, 2025, RxSight reported that third quarter 2025 revenue was 14% lower than in the third quarter of 2024 and that LDD sales had fallen 68% year over year.

162. The Company's senior leadership has since turned over. On December 22, 2025, RxSight announced that Defendant Thunen would step down as CFO; she was replaced effective January 11, 2026. On July 15, 2026, RxSight announced that the Board had appointed Mottiwala as President and CEO, replacing Defendant Kurtz, who resigned from the Board and transitioned to the role of Chief Medical Officer.

## THE SECURITIES CLASS ACTION

163. On May 21, 2026, the Honorable Fred W. Slaughter denied the defendants' motion to dismiss the Securities Action in its entirety and ordered the defendants to answer the Amended Complaint (the "MTD Order"). As to falsity, the Court rejected the defendants' arguments that the challenged statements were accurate, inactionable puffery, or protected opinion, holding:

> Here, the court finds the Amended Complaint sufficiently alleges the challenged statements "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed," Quality Systems, 865 F.3d at 1144 (alterations adopted) (quoting Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002)); addressed measurable or objectively verifiable metrics; professed beliefs Defendants did not hold or which were objectively untrue; supplied supporting facts that were untrue; or omitted facts going to the basis for Defendants' opinion whose omission made the opinion statement misleading to a reasonable person reading the statement fairly and in context, Dearborn Heights, 856 F.3d at 615-16; Rivian Auto., Inc., 2025 WL 2426714, at *5 (C.D. Cal. Aug. 20, 2025).

164. The Court further held that the Amended Complaint adequately alleged an Item 303 claim, stating:

> Here, the court finds the Amended Complaint adequately alleges facts supporting the contention that Defendants' omissions rendered their affirmative statements misleading.

165. As to scienter, the Court held:

> In this case, the court finds the Amended Complaint adequately alleges facts that, under a holistic review, create a strong inference of scienter. First, the Amended Complaint sufficiently alleges facts creating a strong inference that Defendants had actual contemporaneous knowledge of facts either contradicting the statements they made or facts which made their omissions material, and deliberately deceived or misled investors.

166. The Court also found that the allegations concerning the "Study Patient" rebate program, Defendants Kurtz's and Thunen's insider sales, the May 2024 secondary offering, and their SOX certifications further support the strong inference of scienter, and that the core operations doctrine lends further support because the RxSight System was the Company's sole product.

## INSIDER SALES

167. Rather than disclose material information to the market, the Insider Selling Defendants used their access to RxSight's material non-public information to sell their personal holdings, or holdings of entities they control or manage, while the Company's stock remained artificially inflated. As directors and officers, the Insider Selling Defendants were entrusted with, and had access to, material, non-public information concerning RxSight's true adoption, utilization, and product-performance trends.

168. While in possession of material non-public information, Defendant Kurtz sold 165,000 shares of RxSight stock for proceeds of approximately $7,684,187.25 before the truth emerged, at prices as high as $60.15 per share. These sales were timed to capitalize on RxSight's artificially inflated stock price, and represented virtually 100% of Defendant Kurtz's total reported proceeds from sales of RxSight stock reported on Form 4. Defendant Kurtz made these sales between December 14, 2023 and May 3, 2024, as set forth below:

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 12/14/2023 | $39.40 | 20,000 | $788,022.00 |
| 12/14/2023 | $40.01 | 20,000 | $800,164.00 |
| 12/27/2023 | $41.09 | 22,500 | $924,498.00 |
| 01/08/2024 | $43.50 | 31,250 | $1,359,375.00 |
| 01/08/2024 | $45.00 | 31,250 | $1,406,256.25 |
| 05/03/2024 | $60.15 | 40,000 | $2,405,872.00 |
| **TOTAL** | | **165,000** | **$7,684,187.25** |

169. While in possession of material non-public information, Defendant Thunen sold 180,174 shares of RxSight stock for proceeds of approximately $8,540,214.83 before the truth emerged. These sales were timed to capitalize on RxSight's artificially inflated stock price. Defendant Thunen made these sales between December 15, 2023 and October 1, 2024, as set forth below:

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 12/15/2023 | $39.31 | 10,000 | $393,120.00 |
| 12/15/2023 | $39.32 | 10,000 | $393,206.00 |
| 12/15/2023 | $39.35 | 20,000 | $786,984.00 |
| 01/02/2024 | $38.77 | 4,519 | $175,191.24 |
| 01/02/2024 | $39.63 | 5,481 | $217,217.51 |
| 01/26/2024 | $47.11 | 31,772 | $1,496,705.84 |
| 02/05/2024 | $47.02 | 9,125 | $429,086.70 |
| 02/06/2024 | $47.47 | 15,875 | $753,573.55 |
| 03/01/2024 | $54.95 | 1,166 | $64,065.87 |
| 03/01/2024 | $56.38 | 6,361 | $358,617.91 |
| 03/01/2024 | $57.03 | 2,473 | $141,041.87 |
| 04/01/2024 | $49.81 | 8,938 | $445,225.02 |
| 04/01/2024 | $49.81 | 8,857 | $441,207.03 |
| 04/01/2024 | $50.24 | 662 | $33,257.69 |
| 04/01/2024 | $50.27 | 800 | $40,218.00 |
| 04/01/2024 | $50.37 | 200 | $10,074.00 |
| 04/01/2024 | $51.50 | 543 | $27,964.50 |

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 05/01/2024 | $52.68 | 9,620 | $506,758.51 |
| 05/01/2024 | $53.04 | 380 | $20,154.21 |
| 07/01/2024 | $58.41 | 8,146 | $475,785.05 |
| 07/01/2024 | $58.55 | 6,599 | $386,366.17 |
| 07/01/2024 | $59.48 | 1,854 | $110,270.36 |
| 07/01/2024 | $59.56 | 1,803 | $107,394.07 |
| 10/01/2024 | $47.96 | 5,201 | $249,422.28 |
| 10/01/2024 | $48.69 | 9,521 | $463,560.35 |
| 10/01/2024 | $49.45 | 278 | $13,747.10 |
| **TOTAL** | | **180,174** | **$8,540,214.83** |

170. While in possession of material non-public information, Defendant Corley, the Chairman of the Board, sold 14,000 shares of RxSight stock, held through the Andy Corley Living Trust and the Juana McKay Living Trust (a trust for which his spouse serves as trustee), for proceeds of approximately $571,527.80 before the truth emerged. These sales were timed to capitalize on RxSight's artificially inflated stock price. Defendant Corley made these sales between December 14, 2023 and January 8, 2024, as set forth below:

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 12/14/2023 | $40.12 | 10,000 | $401,224.00 |
| 12/14/2023 | $40.12 | 2,000 | $80,245.20 |
| 01/08/2024 | $45.03 | 2,000 | $90,058.60 |
| **TOTAL** | | **14,000** | **$571,527.80** |

171. While in possession of material non-public information, Defendant Link, then serving as a member of the Audit Committee, sold 28,250 shares of RxSight stock through Link Family Enterprise, L.P. for proceeds of approximately $1,403,120.10 on February 1, 2024. These sales are set forth below:

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 02/01/2024 | $49.54 | 20,598 | $1,020,455.82 |
| 02/01/2024 | $50.01 | 7,652 | $382,664.28 |
| **TOTAL** | | **28,250** | **$1,403,120.10** |

172. While in possession of material non-public information, Defendant Andrews, the Chair of the Audit Committee, sold 15,625 shares of RxSight stock for proceeds of approximately $906,288.14 before the truth emerged. These sales were timed to capitalize on RxSight's artificially inflated stock price. Defendant Andrews made these sales on June 14, 2024, as set forth below:

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 06/14/2024 | $57.84 | 11,940 | $690,608.41 |
| 06/14/2024 | $58.53 | 3,685 | $215,679.73 |
| **TOTAL** | | **15,625** | **$906,288.14** |

173. While in possession of material non-public information, Defendant Warner, then the Chair of the Governance Committee, sold 43,750 shares of RxSight stock, held through the Cabo Living Trust, for proceeds of approximately $1,714,445.41 before the truth emerged. These sales were timed to capitalize on RxSight's artificially inflated stock price. Defendant Warner made these sales between December 8, 2023 and January 8, 2024, as set forth below:

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 12/08/2023 | $35.01 | 14,502 | $507,706.32 |
| 12/11/2023 | $35.08 | 5,498 | $192,845.10 |
| 01/08/2024 | $42.37 | 16,530 | $700,389.32 |
| 01/08/2024 | $43.42 | 7,220 | $313,504.67 |
| **TOTAL** | | **43,750** | **$1,714,445.41** |

174. While in possession of material non-public information, Defendant Maniar, a member of the Governance Committee, sold 20,118 shares of RxSight

stock for proceeds of approximately $863,501.77 before the truth emerged. These sales were timed to capitalize on RxSight's artificially inflated stock price. Defendant Maniar made these sales between January 8, 2024 and January 22, 2025, as set forth below:

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 01/08/2024 | $45.00 | 6,418 | $288,810.00 |
| 01/18/2024 | $45.69 | 3,520 | $160,811.55 |
| 01/18/2024 | $45.76 | 2,879 | $131,743.90 |
| 11/26/2024 | $45.88 | 3,782 | $173,518.16 |
| 01/22/2025 | $30.87 | 3,519 | $108,618.16 |
| **TOTAL** | | **20,118** | **$863,501.77** |

175. While in possession of material non-public information, Defendant Fountain, a member of the Audit Committee, sold 7,000 shares of RxSight stock for proceeds of approximately $180,001.50 before the truth emerged. These sales were timed to capitalize on RxSight's artificially inflated stock price. Defendant Fountain made these sales on March 12, 2025, as set forth below:

| TRADE DATE | PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 03/12/2025 | $25.71 | 7,000 | $180,001.50 |
| **TOTAL** | | **7,000** | **$180,001.50** |

176. In total, the Insider Selling Defendants sold approximately $21.9 million of RxSight stock at artificially inflated prices while in possession of material, non-public information, including approximately $5.6 million by the Company's outside directors.

177. The Board did not merely profit from the inflated stock price through these sales. As disclosed in the 2025 Proxy, when approving the named executive officers' 2024 stock option awards in February 2024, the Board, upon the

recommendation of the Compensation Committee, took into account the 93% increase in RxSight's stock price between November 2023 and February 2024 and approved grants covering more shares than its ordinary methodology would have produced at the inflated price, in order to offset much of that increase. The grant date fair value of the option award to Defendant Kurtz was $5,537,883, and the grant date fair value of the option awards to each of the other named executive officers, including Defendant Thunen, was $3,426,797.

## DAMAGES TO RXSIGHT

178. As a direct and proximate result of the Individual Defendants' misconduct, RxSight has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

179. Such expenditures include, but are not limited to, legal fees associated with the Securities Action, as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

180. These expenditures also include, but are not limited to, the Company's exposure to class-wide damages in the Securities Action, which has survived a motion to dismiss and is proceeding toward discovery.

181. These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, stock option awards inflated in light of the artificially inflated stock price, as well as other benefits provided to those Individual Defendants.

182. As a direct and proximate result of the Individual Defendants' actions, RxSight has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's

stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

183. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by and other misconduct by the Individual Defendants.

184. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

185. Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

186. Plaintiff understands its obligation to hold stock throughout the duration of this action and is prepared to do so.

187. During the illegal and wrongful course of conduct at the Company, the Board consisted of the Director Defendants.

188. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

189. The Board of RxSight is currently comprised of nine members: Defendants Corley, Link, Tammenoms Bakker, Andrews, Palmisano, Warner, Maniar, and Fountain (the "Demand Director Defendants"), together with non-defendant Mottiwala (together, the "Demand Board"). Plaintiff is therefore only required to show that at least half of the Board, i.e., five, cannot exercise independent, disinterested business judgment regarding whether to pursue this

action. Here, eight of the nine members of the Demand Board are defendants who served on the Board throughout the Relevant Period.

190. Each of the Demand Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and is therefore not a disinterested party.

191. Each of the Demand Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and is a principal beneficiary of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it. Each of the Demand Director Defendants signed the 2024 10-K, and each solicited the 2024 Proxy and the 2025 Proxy.

192. Additionally, the Demand Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

***Defendants Andrews, Tammenoms Bakker, Link, and Fountain***

193. Defendants Andrews (Chair), Tammenoms Bakker, Link, and Fountain are **not** disinterested or independent and, therefore, are incapable of considering demand because they served as members of the Audit Committee during some or all of the Relevant Period. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting, internal controls, and compliance with applicable law, including the federal securities laws. The Charter specifically charged these Defendants with reviewing the Company's Forms 10-K and 10-Q, including the MD&A disclosures, and its earnings press releases and earnings guidance. Thus,

these Defendants were responsible for knowingly or recklessly allowing the improper statements. Further, these Defendants reviewed and approved the improper press releases and periodic reports made to the public. Despite their knowledge, these Defendants caused these improper statements to be issued.

194. For these reasons, Andrews, Tammenoms Bakker, Link, and Fountain breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

***Defendants Warner, Link, Andrews, Maniar, Corley, and Fountain***

195. Defendants Warner, Link, Andrews, Maniar, Corley, and Fountain are **not** disinterested or independent and, therefore, are incapable of considering demand because, while in possession of material, non-public information, they sold or caused the sale of 43,750, 28,250, 15,625, 20,118, 14,000, and 7,000 shares of the Company's stock, respectively, at various prices per share, for a windfall of approximately $5.6 million collectively, and these sales demonstrate their motives in facilitating and participating in the misleading statements. As a result of their insider selling, these six Demand Director Defendants, who constitute a majority of the Demand Board, may be personally subject to disgorgement, and thus demand upon them is futile and, therefore, excused.

196. In addition, Defendant Tammenoms Bakker cannot impartially consider a demand to investigate or pursue claims arising from insider trading during the Relevant Period. As alleged above, LVP II, an investment fund whose general partner Defendant Tammenoms Bakker co-manages, sold 994,313 shares of RxSight stock for approximately $28.3 million in November 2023, at artificially inflated prices and without any disclosed Rule 10b5-1 trading plan. Any good-faith investigation of insider trading during the Relevant Period would necessarily examine those sales, requiring Defendant Tammenoms Bakker to evaluate trading

by an entity she co-manages and in which she holds a pecuniary interest. Defendant Tammenoms Bakker therefore lacks the disinterestedness and independence necessary to consider a demand with respect to the misconduct alleged herein.

***All Demand Director Defendants***

197. The Demand Director Defendants, as members of the Board, were and are subject to the Code of Conduct, which goes well beyond the basic duties required by applicable laws, rules, and regulations. Specifically, the Code of Conduct requires directors to act in good faith, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Demand Director Defendants violated the Code of Conduct because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Demand Director Defendants breached the Code of Conduct, face substantial liability, and are not independent or disinterested, making demand upon them futile.

198. Furthermore, demand, in this case, is excused because the Demand Director Defendants, who are named as defendants in this action, control the Company and are indebted to each other. The Demand Director Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, according to the Company's proxy statements: Defendant Corley is a partner at Flying L Partners, while Defendant Link formed and is the Managing Partner of Flying L Management, LLC; Defendant Corley co-founded Chiron Vision Corp., of which Defendant Link was founder, chairman, and CEO; Defendant Palmisano served as President and CEO of IntraLase Corp., which Defendant Kurtz co-founded and where Defendant Thunen served as CFO, and Defendant Link was a director of Advanced Medical Optics, Inc., which acquired IntraLase; Defendants Andrews and Palmisano served together in senior

leadership of Wright Medical Group; Defendant Andrews is CFO of Orthofix Medical, on whose board of directors Defendant Maniar serves; Defendant Palmisano serves on the board of directors of AEON Biopharma, on whose board Defendant Thunen has served as audit committee chair; and Defendant Thunen previously served on the board of eyeonics, Inc., which Defendant Corley co-founded and led as CEO and Chairman. These conflicts of interest precluded the Demand Director Defendants from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct. Thus, any demand upon the Demand Director Defendants would be futile.

199. RxSight has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Demand Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for RxSight any part of the damages RxSight suffered and will continue to suffer, thereby. Thus, any demand to the Demand Director Defendants would be futile.

200. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Demand Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Demand Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

201. The acts complained of herein constitute violations of fiduciary duties owed by RxSight's officers and directors, and these acts are incapable of ratification.

202. The Demand Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of RxSight. If there is a directors' and officers' liability insurance policy covering the Demand Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Demand Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Demand Director Defendants were to sue themselves or certain of the officers of RxSight, there would be no directors' and officers' insurance protection. Accordingly, the Demand Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Demand Director Defendants is futile and, therefore, excused.

203. If there is no directors' and officers' liability insurance, then the Demand Director Defendants will not cause RxSight to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

204. Thus, for all of the reasons set forth above, all of the Demand Director Defendants, and, if not all of them, certainly at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## COUNT I

### Against the Individual Defendants

### For Breach of Fiduciary Duty

205. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of RxSight's securities. In so doing, the Individual Defendants also violated the duties set forth in the Code of Conduct and, as to the Director Defendants and the Audit Committee Defendants, respectively, the Governance Guidelines and the Audit Committee Charter.

207. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

208. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, RxSight has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209. Plaintiff, on behalf of RxSight, has no adequate remedy at law.

**COUNT II**

**Against the Director Defendants**

**For Violating Section 14(a) of the Exchange Act**

210. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

211. Pursuant to Section 14(a) of the Exchange Act, "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

212. Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, prohibits proxy statements from containing "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

213. In the exercise of reasonable care, the Director Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

214. The false and misleading Proxies caused the re-election of Defendants Andrews, Palmisano, and Fountain at the June 6, 2024 annual meeting and of Defendants Kurtz, Corley, and Tammenoms Bakker at the June 3, 2025 annual meeting, allowing them to continue breaching their fiduciary duties to RxSight, and caused shareholders to approve, on an advisory basis, the compensation of the Company's named executive officers.

215. As a direct and proximate result of the material misrepresentations and omissions in the Proxies filed during the Relevant Period by the Director Defendants, the Company suffered damages.

216. Plaintiff, on behalf of RxSight, has no adequate remedy at law.

## COUNT III

### Against the Insider Selling Defendants for Breach of Fiduciary Duty – Misappropriation of Material, Non-Public Information

217. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218. At the time that the Insider Selling Defendants sold their RxSight stock, they knew the material, non-public information described above and sold stock motivated, in whole or in part, by the substance of such information.

219. The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold RxSight stock.

220. The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

221. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, any profits made by the Insider Selling Defendants as a result of their stock sales should be disgorged and the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**<u>COUNT IV</u>**

**Against the Individual Defendants**

**For Unjust Enrichment**

222. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

223. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information and facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, RxSight.

224. Each of the Individual Defendants received payment from RxSight, in the form of either salary or director fees while actively breaching their fiduciary duties to RxSight.

225. All the payments and benefits provided to the Individual Defendants were at the expense of RxSight. The Company received no benefit from these payments.

226. Plaintiff, as a shareholder and a representative of RxSight, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

227. Plaintiff, on behalf of RxSight, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants

### For Waste of Corporate Assets

228. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused RxSight to waste valuable corporate assets, including by approving stock option awards sized to offset the artificially inflated stock price, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

230. As a result of the waste of corporate assets alleged herein, the Individual Defendants are liable to RxSight.

***PRAYER FOR RELIEF***

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that Plaintiff may maintain this action on behalf of RxSight and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to RxSight;

c) Determining and awarding to RxSight the damages sustained by it, or disgorgement or restitution owed to it, as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing RxSight to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: November 25, 2026

ROSMAN & GERMAIN APC

*/s/ Daniel L. Germain*

______________________________

DANIEL L. GERMAIN (CA SBN #143334)
germain@lalawyer.com
5959 Topanga Canyon Blvd.
Suite 360
Woodland Hills, CA 91367
(818) 788-0877

KUEHN LAW, PLLC
Justin A. Kuehn
justin@kuehn.law
53 Hill Street, Suite 605
Southampton, NY 11968
Telephone: (833) 672-0814

Attorneys for Plaintiff

## VERIFICATION

I, Joseph Brecknell, am the director of Rhodium Pizza Pty Ltd ("Rhodium"), the plaintiff in this action. I am fully authorized to make this verification on Rhodium's behalf. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. To those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and, for that reason, believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 11 / 18 / 2026

Joseph Brecknell, on behalf of Rhodium Pizza Pty Ltd
Director, Rhodium Pizza Pty Ltd

Doc ID: 18f71b8e85d4a89e952b5a22375d939778195322